859 F.2d 1134
 28 ERC 1640, 19 Envtl. L. Rep. 20,192
 The TOWN OF HUNTINGTON, The County of Suffolk, The County of
Nassau, The Town of North Hempstead, The Town of
Oyster Bay, and Robert J. Mrazek,
Plaintiffs-Appellees,
v.
John O. MARSH, Jr., Secretary of the U.S. Army, Lt. Gen.
Joseph K. Bratton, Chief of the Corps of Engineers, Colonel
C.E. Edgar III, District Engineer, Army Corps of Engineers,
New England Division, and Department of the Army Corps of
Engineers of the United States of America, Defendants-Appellants.
 No. 1383, Docket 88-6095.
 United States Court of Appeals,
Second Circuit.
 Argued July 18, 1988.
Decided Oct. 19, 1988.
 
 Robin L. Greenwald, Asst. U.S. Atty., Brooklyn, N.Y. (Andrew J. Maloney, U.S. Atty., E.D.N.Y., Robert L. Begleiter, Asst. U.S. Atty., of counsel), for defendants-appellants.
 Joseph D. Pizzurro, New York City (John P. Campbell, Peter K. Vigeland, Peter Sullivan, Curtis, Mallet-Prevost, Colt & Mosle, New York City, Arlene Lindsay, Daniel Martin, Town Attys., Huntington, N.Y., of counsel), for plaintiffs-appellees.
 Before ALTIMARI and MAHONEY, Circuit Judges, and CEDARBAUM, District Judge.*
 ALTIMARI, Circuit Judge:
 
 
 1
 The Long Island Sound (the "Sound") is host to a myriad of recreational and industrial uses, including swimming, boating and fishing. Recreational users, commercial fisheries and environmentalists share a sometimes uneasy co-existence with use of the Sound as a waste dumping ground. Marinas and harbors which line the Sound must be dredged periodically to provide safe berthing for pleasure craft, commercial fishing boats, and military ships. The spoil from these dredging operations has for decades been dumped into the Sound. This litigation arises out of the ongoing effort of citizens and the federal government to balance the use of the Sound as a waste dumpsite with the need to protect its increasingly fragile waters.
 
 
 2
 The United States Army Corps of Engineers, et al. (the "Corps") appeal from a judgment entered in the United States District Court for the Eastern District of New York (Jacob Mishler, Judge ), denying their cross-motion for summary judgment, and granting plaintiffs' motions for summary judgment and a permanent injunction. The district court held that a 1980 amendment to the Marine Protection, Research and Sanctuaries Act of 1972, 33 U.S.C. Secs. 1401 et seq. (1982) ("Ocean Dumping Act" or "Act") applies to initial designation of an open water waste dumpsite in the Sound. The district court also held that an environmental impact statement ("EIS") submitted by the Corps was inadequate under both the Ocean Dumping Act and the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. Secs. 4321 et seq. (1982 & Supp. III 1985) for its failure to discuss fully the types, quantities and cumulative effects of waste disposal at a new dumpsite. The district court enjoined the Corps from issuing dumping permits for dredged waste disposal in the Sound until the Corps issues a supplemental EIS which fully complies with NEPA and the Ocean Dumping Act.
 
 
 3
 On this appeal, the Corps contends that the Act does not apply to designation of a new dumpsite in the Sound because the Sound is inland not "ocean waters," and because permit applicants who were to utilize the new site were exempt from regulation under the Act. Specifically, the Corps argues that the Ocean Dumping Act as it relates to the Sound is triggered only when the Corps is presented with an application concerning a federal project or a nonfederal project of more than 25,000 cubic yards ("cys"). In all other situations, according to the Corps, the Sound is governed by the Clean Water Act and not by the Ocean Dumping Act. The Corps also contends that its EIS was adequate because the Corps was required to consider the types, quantities and cumulative effects of waste dumping at the new site only on a case-by-case basis and not at the time the site was chosen. Finally, the Corps asserts that the district court erred as a matter of law when it issued an injunction prohibiting the Corps from violating NEPA.
 
 
 4
 For the reasons that follow, the judgment of the district court granting plaintiffs' motion and denying defendants' cross-motion for summary judgment is affirmed. The permanent injunction is vacated, and the case is remanded for further proceedings.
 
 BACKGROUND
 
 5
 In the fall of 1980, the Corps received applications from 23 parties (the "Applicants") requesting permits to conduct dredging operations on their properties in Mamaroneck, New York and to dispose of the dredged material in an ocean dumpsite. The Applicants were mainly owners and operators of marinas in Mamaroneck Harbor located on the Sound. The Corps had previously announced its intention to dredge federal waterways in the area, and the Applicants wished to take advantage of the presence of dredging contractors who were to perform the federal maintenance operation. They hoped to reduce the expense of their dredging operations since dredging equipment would already be in place in the harbor. Consequently, the Applicants initially requested to dispose of their waste material in an area called the "Mud Dump Site" where the Corps was also to dispose of its spoils. The Mud Dump Site, located in the Atlantic Ocean off the New Jersey coast, has been in use as a dredge waste dumpsite for more than seventy years and since 1960 has received over 9.5 million cys of waste. The Corps planned to add some 60,000-145,000 cys of waste from its Mamaroneck Harbor project; the Applicants collectively planned to add approximately 86,000 cys of waste, though no individual project was to exceed 25,000 cys.
 
 
 6
 Regulations promulgated under the Ocean Dumping Act require analysis of the types of sediments to be dredged before permits may be issued. To satisfy this requirement, the Applicants requested that the Corps accept the results of the Corps' own federal sampling of Mamaroneck Harbor. The Corps agreed to accept its data as representative of the Applicants' sediments and found that sediments from Mamaroneck Harbor would have no significant impact if disposed at the heavily used Mud Dump Site. On March 23, 1981, the Corps issued permits to the Applicants for the Mud Dump Site. However, because of fiscal and time constraints, the Applicants were not able to accomplish their dredging. As a result, on the same day that they were issued Mud Dump Site permits, the Applicants asked the Corps to modify the permits to allow disposal of their waste at "the closest available site" in the Sound.
 
 
 7
 In their modification request, the Applicants asked to be considered as a single entity in order to demonstrate the need for a dumpsite in the Sound, stating that they would "ultimately enter into a collective contract which would insure that the total yardage to be assembled and dumped would exceed 25,000 cubic yards." At the same time, they asked to be considered individually in order to avoid the environmental testing requirements of the Ocean Dumping Act. The Corps issued a public notice of the modification request and indicated that test results from the previous Mamaroneck Harbor study would be used to evaluate the request. The Corps granted the Applicants' request, permitting them to dump at the Central Long Island Sound ("CLIS") dumpsite located off the shores of New Haven, Connecticut.
 
 
 8
 On September 1, 1981, the Applicants again requested that their permits be modified, this time to allow dumping further west in the Sound. The purpose of the modification was to gain access to a site which would entail lower transportation costs than the CLIS site. The Applicants, still acting collectively, stated that the new modification might be "the difference between the entire project going forward, being severely cut back, or indefinitely postponed." However, of the 19 historically used sites scattered throughout the Long Island Sound, 16 had been closed for environmental reasons, leaving the western Sound without a dumpsite. In order to fulfill the modification request, the Corps was required to designate a new dumpsite. The Applicants suggested that there were several potential sites which could be used, including "the triangle site bordered by the old [closed] Stamford, Norwalk and Eatons Neck Dump Sites." The Corps adopted this suggestion, proposing to designate this site located off the shores of Huntington, New York as Western Long Island Sound III ("WLIS III"). The Corps also proposed to utilize the newly designated site as the repository for spoils from additional federal dredging projects. In its public notice announcing the proposal to designate WLIS III, the Corps listed two "[p]lanned Federal projects which could be served" by the new site. The Corps intended to dredge 530,000 cys of waste from Flushing Bay, New York and 30,000 cys from Mianus River, Connecticut. With the addition of the 86,000 cys from Mamaroneck Harbor, the new site from its inception was intended to be the repository of at least 646,000 cys of dredged waste material--well in excess of the 560,000 cys projected for WLIS III by the Corps in its public notice.
 
 
 9
 The designation of a new dumping ground in the western Sound is a "major Federal action" requiring an EIS under NEPA. See 42 U.S.C. Sec. 4332(2)(C). Accordingly, public hearings were held in late October 1981 to discuss designation of the new site. Predictably, those in attendance at the hearings held in Mamaroneck and Norwalk generally were in favor of the proposal, while those at the Huntington meeting generally were opposed to the site designation. On December 9, 1981, the Corps published its intention to submit an EIS for the WLIS III site, and issued its draft EIS ("DEIS") nine days later.
 
 
 10
 The DEIS was written to "describe[] the impacts" of designating an open water disposal site in the western Sound. In its discussion of the needs and objectives for the new site, the Corps stated that the proposed site would "service the ports and harbors within the Western Long Island Sound area" and cited the 23 Mamaroneck Applicants as potential users of the newly designated location. In its discussion of alternatives to the proposed action, the Corps specifically considered 13 potential sites, including WLIS III. The Corps immediately eliminated 11 of these sites, stating that eight sites had already been closed for environmental reasons, two were being used as lobster fisheries, and one was not viable because it was located in a cable area used by electric utility companies. The DEIS purported to analyze the remaining open water site, WLIS III, and the possibility of taking "no action."
 
 
 11
 Much of the data used in the DEIS was extrapolated from the draft of a programmatic EIS for Long Island Sound (the "DPEIS"). The DPEIS, undertaken several years earlier, was a generic impact study of dredged waste disposal in the entire Long Island Sound and was not intended to focus specifically on any single site. The Corps incorporated the DPEIS into the impact statement for the purpose of providing general environmental data about the area surrounding WLIS III.
 
 
 12
 Citing the fact that "[t]here presently exists no chemical data on the sediments at the [proposed] site," the Corps omitted chemical analysis of WLIS III sediments in its EIS. Evaluation of water quality at the proposed site was also omitted, in favor of a generalized discussion of western Sound waters taken from the DPEIS. Analysis of specific environmental impacts of disposal at WLIS III were "to be addressed on a dredging project specific basis" at a later stage, when individual permit applications were evaluated. Although the DEIS indicated that there would be a "short term release of sediment contaminants into the water column" at WLIS III, the precise nature of the contamination "would depend on the nature of the sediments" which would not be known until after designation of the site. Similarly, analysis of toxicity to living organisms at the site was deferred to the permit evaluation stage as was analysis of chemical contamination to the floor of the WLIS III site.
 
 
 13
 The Corps solicited comments regarding the DEIS from relevant federal, state and local environmental agencies, and interested private citizens. Comments critical of the DEIS included letters from the Department of Commerce Office of Marine Pollution Assessment, the Fish and Wildlife Service, the Town of Huntington and numerous others. The Department of the Interior Office of Environmental Project Review complained of the lack of "critical analysis of alternatives" in the DEIS, stating that the majority of alternatives presented "appear[ed] to be 'straw men' " since most had either been closed or were committed to other uses. The Suffolk County Executive and the Long Island Sound Taskforce complained that the DEIS failed adequately to detail likely users of the new site. Most of the additional criticism received by the Corps was directed at the apparent haste with which the draft was prepared, lack of data on the types and quantities of material to be disposed of, lack of analysis of the cumulative effects of disposal at WLIS III, and lack of data specific to the WLIS III site.
 
 
 14
 A final EIS ("FEIS") was issued on February 12, 1982 substantially unchanged from the DEIS. In response to the critical comments received, the FEIS listed 24 federally authorized channels in the western Long Island Sound which "could potentially utilize the WLIS III disposal site." These channels included Mamaroneck Harbor, and were in addition to the Applicants' dredging projects. The Corps reiterated that the types, quantities and cumulative effects of disposal would be analyzed on a case-by-case basis during review of permit applications. Thus, sediments from the 23 harbors other than Mamaroneck were not evaluated for their effects on WLIS III.
 
 DISCUSSION
 
 15
 The Corps principally contends on this appeal that NEPA requires only that an agency follow certain specified procedures in reaching its decision. The Corps maintains that the statute's requirements are fulfilled when an agency's conclusions in the EIS have a substantial basis in fact and the EIS considers reasonable opposing views. The Corps also contends that the district court's issuance of a permanent injunction was erroneous as a matter of law.
 
 A. Applicability of the Ocean Dumping Act
 
 16
 The opposing parties in the instant case rely heavily on regulations promulgated under the Ocean Dumping Act in arriving at their positions. We review the question of whether the Act applies to designation of a new disposal site in the Sound by bearing in mind that an agency is entitled to deference regarding interpretation of regulations it participated in formulating and is charged with administering. Bersani v. Robichaud, 850 F.2d 36, 45 (2d Cir.1988) and cases cited therein; National Wildlife Federation v. Benn, 491 F.Supp. 1234, 1245 (S.D.N.Y.1980). This Court, however, will affirm the decision of the district court if we concur in its finding that the Corps' action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. Sec. 706(2)(A); see Bersani, 850 F.2d at 46.
 
 1. Legislative history
 
 17
 Recognizing the dangers of unregulated dumping of waste materials into ocean waters, Congress in 1972 enacted the Ocean Dumping Act, 33 U.S.C. Secs. 1401 et seq. (1982). Under the Ocean Dumping Act, the Secretary of the Army, through the United States Army Corps of Engineers, shares responsibility with the Administrator of the Environmental Protection Agency ("EPA") for implementing federal environmental policies and goals with regard to ocean dumping. The Corps is given responsibility, with oversight from the EPA, for issuing permits for transportation and disposal of dredged wastes into the ocean. 33 U.S.C. Sec. 1413.
 
 
 18
 Congress amended the Ocean Dumping Act in 1980 to require that dumping of dredged material in Long Island Sound by federal agencies, or by private parties whose projects exceed 25,000 cys of waste, be subject to the environmental testing criteria of the Act. 33 U.S.C. Sec. 1416(f). These criteria establish strict standards for determining whether and where dredged wastes may be disposed in the ocean and are more stringent than those promulgated under the Federal Water Pollution Control Act, 33 U.S.C. Secs. 1251 et seq. (1982 & Supp. III 1985) (the "Clean Water Act"), which regulates the Corps' dredged waste permit program for inland waters. Thus, the 1980 amendment subjects the Sound to two qualitatively different regulatory schemes.
 
 
 19
 The 1980 amendment to the Ocean Dumping Act reads in pertinent part:
 
 
 20
 the dumping of dredged material in Long Island Sound from any Federal project (or pursuant to Federal authorization) or from a dredging project by a non-Federal applicant exceeding 25,000 cubic yards shall comply with the criteria established pursuant to the second sentence of section 1412(a) of this title relating to the effects of dumping.
 
 
 21
 33 U.S.C. Sec. 1416(f). The bill was proposed in order to "amend existing law to consider the Long Island Sound as ocean waters for the purpose of ocean dumping regulation." H.R.Rep. No. 894, Part 1, 96th Cong., 2d Sess. 2 (1980) U.S.Code Cong. & Admin.News p. 2572 (emphasis added). Congress declined to recharacterize the Sound as "ocean waters" in the definitional sense, choosing instead to focus on the permit evaluation process as a means of applying Ocean Dumping criteria.
 
 
 22
 An interim proposal provided that "any permit issued under section 404 of the Clean Water Act" for dredged waste disposal in the Sound be subject to the testing criteria of the Ocean Dumping Act. 126 Cong. Rec. H31919 (Dec. 3, 1980). However, this version led to concerns that marina owners "engaged in small dredging projects" would be unduly burdened by "an unrealistically costly set of testing standards." 126 Cong.Rec. H34063 (Dec. 13, 1980) (remarks of Rep. Studds). The final version of the bill thus provided that "small marine owners dumping less than [25,000] cubic yards would be exempt" from the testing requirements of the Ocean Dumping Act. 126 Cong.Rec. S33788 (Dec. 12, 1980) (remarks of Sen. Moynihan).
 
 
 23
 The exemption notwithstanding, Congress intended that "the bulk" of dredged waste dumping be subject to the ocean dumping criteria. In enacting the bill, Congress noted that federal projects and private operations exceeding 25,000 cys comprised "94 percent of all dredged material dumped in the sound." 126 Cong.Rec. H34063 (Dec. 13, 1980) (remarks of Rep. Ambro). Private dredging operations consisting of less than 25,000 cys would "still be subject to the Clean Water Act criteria." Id. The amendment obviously was intended to strengthen permit evaluation procedures regarding dredged waste disposal in the Sound. However, an ambiguity exists whether designation of a new site is encompassed by the amendment. We think the answer lies in the regulatory scheme for permit evaluations.
 
 2. Permit evaluation procedures
 
 24
 Under both the Clean Water Act and the Ocean Dumping Act, site designation is part of the permit evaluation process. See National Wildlife Federation v. Costle, 629 F.2d 118, 127 (D.C.Cir.1980) (Corps' designation of dumpsite is exercise of its permit licensing authority). The Clean Water Act's permit review regulations, 33 C.F.R. Sec. 323.6(a), require the Corps to "review applications for permits for the discharge of dredged or fill material ... in accordance with guidelines promulgated by the Administrator [of the] EPA," and refer the Corps to EPA site designation regulations, 40 C.F.R. Part 230. Similarly, the Ocean Dumping Act regulations, 33 C.F.R. Sec. 324.1, set forth procedures to be followed by the Corps "in connection with the review of applications for ocean dumping permits" at dumping sites designated under 40 C.F.R. Part 228.
 
 
 25
 The Corps contends that 40 C.F.R. Part 228 applies only to the evaluation of permits and not to designation of a new site. We think the Corps reads the regulations too narrowly. Section 228.4(e)(2), titled "Dredged Material Permits", clearly envisions situations "where a recommended disposal site has not been designated by the Administrator, or where it is not feasible to utilize a recommended disposal site that has been designated by the Administrator." In those situations, Section 228.4(e)(2) provides that the Corps "shall, in consultation with EPA, select a site" in accordance with specific criteria for site selection promulgated by the EPA. (emphasis added). When the Applicants requested permits for a site in the western Sound, the Corps was presented with a situation in which it was "not feasible to utilize a recommended disposal site." As the Corps indicated in its public notice on the newly proposed site, designation of WLIS III was undertaken in order to provide the Applicants with a less costly disposal site as well as to provide for the Flushing Bay and Mianus River federal projects.
 
 
 26
 Congress was emphatic that the Ocean Dumping Act was not intended to permit large private dredgers "to evade additional testing requirements by breaking an integral project involving more than 25,000 cubic yards into smaller pieces." 126 Cong.Rec. H34063 (Dec. 13, 1980) (remarks of Rep. Ambro). Although the Applicants clearly considered themselves to be a unit for purposes of obtaining permission to dump in the Sound, they wanted to be treated separately in order to avoid "costly sampling and testing such as bio-assay sampling" required by the ocean dumping criteria. By entering into a "collective contract," the Applicants sought to gain the economic benefits of a large dredging project while evading the testing requirements of the Act.
 
 
 27
 We have serious doubts as to whether the Corps should have considered the Applicants separately given that the total yardage of waste collected among them would exceed 25,000 cys. The Corps has simply done for the Applicants what the Applicants are not permitted to do for themselves, i.e., evade the ocean dumping criteria for projects in excess of 25,000 cys.
 
 
 28
 Even assuming that the Applicants were entitled to be treated separately and thus were exempt under the Act, the Corps' own plans to dredge 560,000 cys of waste from Flushing Bay and Mianus River were not exempt, nor were the remaining federally authorized harbor projects listed in the FEIS. There is no question that federal projects are covered by the 1980 amendment and not by the standards of the Clean Water Act. We therefore agree with Judge Mishler that the Ocean Dumping Act applies to the designation of WLIS III.
 
 B. Sufficiency of the EIS
 
 29
 We turn now to the question of whether the EIS submitted by the Corps satisfied the rigorous requirements of the Act.
 
 
 30
 The sufficiency of an EIS is determined according to the "rule of reason," under which the EIS will be upheld as adequate if it has been
 
 
 31
 compiled in good faith and sets forth sufficient information to enable the decision-maker to consider fully the environmental factors involved and to make a reasoned decision after balancing the risks of harm ... against the benefits to be derived from the proposed action, as well as to make a reasoned choice between alternatives.
 
 
 32
 County of Suffolk v. Secretary of Interior, 562 F.2d 1368, 1375 (2d Cir.1977), cert. denied 434 U.S. 1064, 98 S.Ct. 1238, 55 L.Ed.2d 764 (1978). This Court of course is "in as good a position as the district court to determine on the undisputed facts what could reasonably be required of the EIS in issue." Id. (citations omitted).
 
 
 33
 After reviewing the voluminous submissions, including the FEIS, DEIS, DPEIS and their various appendices, we conclude that the EIS submitted by the Corps did not adequately analyze the types, quantities and cumulative effects of spoil to be dumped at WLIS III. Although data from an earlier federal survey of the Mamaroneck Harbor was included in the EIS, that data was insufficient to permit an informed site designation decision by the Corps. The vast bulk of material, 560,000 cys of waste from Flushing Bay and Mianus River, was not analyzed in the study. While we agree with the Corps that it was not required to engage in a "crystal ball inquiry" into all possible future permit applications for purposes of a site designation study, see Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc., 435 U.S. 519, 551, 98 S.Ct. 1197, 1215, 55 L.Ed.2d 460 (1978) (EIS is not defective simply because agency fails to "ferret out every possible alternative"); County of Suffolk, 562 F.2d at 1378 (EIS need not include mere speculation as to future events), the possibility that the WLIS III site would be utilized by two federal projects involving 560,000 cys of waste was certainly foreseeable. The Corps' public notice announcing hearings on the designation of WLIS III listed the Flushing Bay and Mianus River projects as "Planned Corps of Engineer Maintenance Dredging" projects. Nevertheless, there was no mention at all of the Flushing Bay project in the final EIS. Moreover, 23 of the 24 harbor projects that were mentioned did not include any data on the types or quantities of their sediments. The sole exception was Mamaroneck Harbor, for which data was available from an earlier survey.
 
 
 34
 The Ocean Dumping Act by its terms contemplates that projects of the magnitude of the Flushing Bay dredging operation be carefully analyzed when making site designation decisions. The dumping permit program for dredged material, 33 U.S.C. Secs. 1413(a) and (b), requires the Corps to determine appropriate locations for dumping in accordance with the criteria set forth in 33 U.S.C. Sec. 1412(a), including the effect of dumping "particular volumes and concentrations" of material, and the "persistence and permanence" of the effects of dumping. 33 U.S.C. Sec. 1412(a)(E) and (F). While Section 1412 of the Ocean Dumping Act outlines the broad parameters of the necessary environmental factors to be considered, it is Section 228.6 of the EPA's site designation guidelines which indicates the requisite specificity of the environmental analysis to be undertaken. Those regulations, captioned "Specific criteria for site selection," require consideration of "[t]ypes and quantities of wastes proposed to be disposed of" and "[e]xistence and effects of current and previous discharges and dumping in the area (including cumulative effects)." 40 C.F.R. Sec. 228.6(a)(4) and (7). Finally, Section 228.6(b) of the EPA site designation guidelines states that this detailed analysis "will be used in the preparation of an environmental impact statement for each site where such a statement is required by EPA policy." Thus, the Corps' decision to prepare an EIS for designation of WLIS III triggered applicability of the full panoply of Ocean Dumping Act criteria, and these criteria should have been considered in formulating the EIS.
 
 C. NEPA
 
 35
 An EIS required under NEPA must assess any adverse effects of a proposed action, alternatives to the proposal, the relationship between short-term use and long-term productivity of the affected environment, and any irreversible and irretrievable commitments of resources which would be involved in the implementation of the proposal. 42 U.S.C. Sec. 4332(2)(C) (1982). The purpose of an EIS is to "compel the decision-maker to give serious weight to environmental factors" in making choices, and to enable the public to "understand and consider meaningfully the factors involved." County of Suffolk, 562 F.2d at 1375 (citing Sierra Club v. Morton, 510 F.2d 813, 819 (5th Cir.1975)). See City of New York v. U.S. Dep't of Transp., 715 F.2d 732, 747-48 (2d Cir.1983), cert. denied, 465 U.S. 1055, 104 S.Ct. 1403, 79 L.Ed.2d 730 (1984) (NEPA is designed to infuse environmental considerations into government decisionmaking).
 
 
 36
 The Council on Environmental Quality ("CEQ") guidelines promulgated under NEPA, 40 C.F.R. Part 1502 (1987), state that the primary purpose of an EIS is to serve as an "action-forcing device to insure that the policies and goals" of NEPA are "infused into the ongoing programs and actions of the Federal Government." Id. Sec. 1502.1. The objective criteria by which this Court will evaluate the Corps' EIS are discussed extensively in Natural Resources Defense Council, Inc. v. Callaway, 524 F.2d 79, 88-89 (2d Cir.1975). That case is strikingly similar to the instant case in that the Callaway decision involved a challenge to an EIS allegedly deficient in its discussion of the types, quantities and cumulative effects of dredged waste disposal projects in the Long Island Sound. There the plaintiff claimed that several projects were pending while the EIS was being prepared by the U.S. Navy and that those projects were sufficiently foreseeable to have been included in the statement. This Court held in Callaway that the EIS failed to meet NEPA's standard of comprehensive evaluation, citing the CEQ guidelines for preparation of an EIS. Id. at 89. We so hold here.
 
 
 37
 The fundamental flaw in the Corps' EIS is its too-circumscribed view of the "project" which is the subject of its impact analysis. The Corps conceives of its "project" as the designation of a disposal site. It has rigidly adhered to the position that site designation and permit issuance are two distinct and unrelated actions. It has steadfastly maintained that particularized discussion of types, quantities and cumulative effects of dredged wastes to be deposited at WLIS III is outside the scope of the EIS and must await analysis on a case-by-case basis. We disagree. This is merely a variant of "segmentation" which has been uniformly rejected by courts. "Segmentation" or "piecemealing" occurs when an action is divided into component parts, each involving action with less significant environmental effects. See City of West Chicago v. United States Nuclear Regulatory Comm'n, 701 F.2d 632, 650 (7th Cir.1983). Segmentation is to be avoided in order to "insure that interrelated projects[,] the overall effect of which is environmentally significant, not be fractionalized into smaller, less significant actions." Taxpayers Watchdog, Inc. v. Stanley, 819 F.2d 294, 298 (D.C.Cir.1987).
 
 
 38
 CEQ guidelines provide that proposals should be included in the same EIS if they are "connected," that is, if they are "closely related" such that they are "interdependent parts of a larger action and depend on the larger action for their justification." 40 C.F.R. Sec. 1508.25(a)(1)(iii). See Save the YAAK Comm. v. Block, 840 F.2d 714, 719 (9th Cir.1988) (analyzing CEQ guidelines on "connected" projects); Hudson River Sloop Clearwater, Inc. v. Dep't of Navy, 836 F.2d 760, 763 (2d Cir.1988) (per curiam) (same). The proper test to determine relatedness under 40 C.F.R. Sec. 1508.25(a)(1)(iii) is whether the project has independent utility. Sloop Clearwater, 836 F.2d at 764 (citing Fritiofson v. Alexander, 772 F.2d 1225, 1242 (5th Cir.1985)). The designation of WLIS III clearly has no utility apart from its planned usage as a disposal site. Designation of a site to contain a contemplated load of 646,000 cys of waste material surely was related to the then-pending applications to dump 86,000 cys and the Corps' own plans to dump the remaining 560,000 cys. It is simply untenable to view site designation as distinct from issuing permits to use the site. We therefore agree with the district court that the Corps violated NEPA by not including a particularized discussion of the types and quantities of sediments to be dumped at WLIS III.
 
 
 39
 Moreover, it is well settled that the cumulative effects of a proposed federal action must be analyzed in an EIS. The Supreme Court in Kleppe v. Sierra Club has stated:
 
 
 40
 when several proposals for ... actions that will have a cumulative or synergistic environmental impact upon a region are pending concurrently before an agency, their environmental consequences must be considered together.
 
 
 41
 427 U.S. 390, 410, 96 S.Ct. 2718, 2730, 49 L.Ed.2d 576 (1976). The genesis of this requirement is in the CEQ guidelines which provide that an EIS should analyze cumulative impacts when to do so is "the best way to assess adequately the combined impacts of similar actions." 40 C.F.R. Sec. 1508.25(a)(3). We do not take issue with particular conclusions reached by an agency after it has taken a "hard look" at environmental factors involved. See City of New York v. U.S. Dep't of Transp., 715 F.2d at 748 (NEPA mandates no particular substantive outcomes). However, it is improper to defer analysis of the types, quantities and cumulative effects of waste dumping when designating a new waste disposal site.
 
 
 42
 Even if the Corps were satisfied with its action, public scrutiny of the basis for the Corps' decision is "essential to implementing NEPA." 40 C.F.R. Sec. 1500.1(b). See Sierra Club v. United States Army Corps of Engineers, 701 F.2d 1011, 1029 (2d Cir.1983) (EIS must set forth sufficient information for general public to make informed evaluation). We note in particular the comments by agency experts from the Department of Interior Office of Environmental Project Review, the Department of Commerce Office of Marine Pollution Assessment, and the Fish and Wildlife Service which indicated that evaluation of the merits of WLIS III as a dumpsite was made difficult or impossible by the lack of sufficient data in the EIS submitted. For these reasons, we hold that the Corps violated NEPA by not including analysis of the types, quantities and cumulative effects of waste disposal in its EIS.
 
 D. Injunctive Relief
 
 43
 Injunctive relief is provided under the terms of the Ocean Dumping Act, 33 U.S.C. Sec. 1415(g)(1), and has been used when appropriate for violations of NEPA. See Sierra Club v. United States Army Corps of Engineers, 732 F.2d 253 (2d Cir.1984) and related cases; Natural Resources Defense Council v. Callaway, 524 F.2d at 95. However, injunctive relief does not follow automatically upon a finding of statutory violations, including environmental violations. On the contrary, "[a]n injunction should issue only where the intervention of a court of equity is essential in order effectually to protect property rights against injuries otherwise irremediable." Weinberger v. Romero-Barcelo, 456 U.S. 305, 312, 102 S.Ct. 1798, 1803, 72 L.Ed.2d 91 (1982) (quoting Cavanaugh v. Looney, 248 U.S. 453, 456, 39 S.Ct. 142, 143, 63 L.Ed. 354 (1919)). Although it may be argued that the proper equitable balancing was implicit in the district court's opinion, issued the same day as the order granting the injunction, neither the opinion nor the order addressed the appropriateness of an injunction on the facts of this case. Accordingly, we vacate the permanent injunction and remand for the purpose of making such a determination, to be guided by traditional equitable principles. We note that the vacating of the injunction need not lead to immediate resumption of dumping at WLIS III, since an application for interim injunctive relief can be made promptly to the district court.
 
 CONCLUSION
 
 44
 Site designation procedures for Long Island Sound ought to be consistent with Congress' intention to afford the Sound "equal or greater protection from polluted dredged spoils [as that afforded to] open ocean waters." 126 Cong.Rec. H34063 (Dec. 13, 1980) (remarks of Rep. Ambro). In order to achieve this goal, the Corps' designation of a new open water disposal site in the Sound must be undertaken in accordance with criteria promulgated under the Ocean Dumping Act.
 
 
 45
 The fragile waters of the Sound are entrusted to the safekeeping of the Corps of Engineers. It is the combination of relevant statutory parameters provided by the ocean dumping criteria and faithful adherence to NEPA's mandate which will insure "excellent decisions" regarding the future of the Sound. Because the Corps did not apply the ocean dumping criteria to its site designation decisions, and because these criteria were omitted from the EIS submitted, the Corps' action was "not in accordance with law." 5 U.S.C. Sec. 706(2)(A).
 
 
 46
 The judgment of the district court granting plaintiffs' motion for summary judgment and denying defendants' cross-motion for summary judgment is affirmed, the permanent injunction is vacated and the case is remanded to the district court for further proceedings consistent with this opinion.
 
 
 
 *
 The Honorable Miriam Goldman Cedarbaum, United States District Court for the Southern District of New York, sitting by designation