John D'AGNILLO, Plaintiff,

v.

UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT; Jack Kemp, as Secretary of HUD; Sam R. Moseley as New York Regional Administrator of HUD; City of Yonkers, New York; Nicholas Wasicsko, as Mayor of the City of Yonkers; Henry Spallone, Nicholas Longo, Harry Oxman, Edward Fagan, Jr., Kevin Condon, Peter Chema, as Councilmen of the City of Yonkers; Neil DeLuca, as City Manager of the City of Yonkers; Municipal Housing Authority of the City of Yonkers; Emmett Burke, as Chairman of the Municipal Housing Authority of the City of Yonkers; Fair Housing Implementation Office of the City of Yonkers; and Karen Hill, as Director of the Fair Housing Implementation Office of the City of Yonkers, Defendants.

No. 89 Civ. 5609 (CSH).

United States District Court, S.D. New York.

April 4, 1990.

See also, 738 F.Supp. 1454.

John D'Agnillo, pro se.

Stuart M. Gerson, Asst. Atty. Gen., Dept. of Justice, Civil Div., Washington, D.C. (Sheila Lieber, Raymond M. Larizza, and Warren J. Bennia, New York City, of counsel), for Federal defendants.

Beveridge & Diamond, P.C., New York City, for Fair Housing Implementation Office of the City of Yonkers and Karen Hill, as Director of the Fair Housing Implementation Office of the City of Yonkers.

Thomas R. DeRosa, of counsel, for City of Yonkers and Neil DeLuca.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

In this action, John D'Agnillo, *pro se*, seeks to enjoin the United States Department of Housing and Urban Development, the City of Yonkers and the other defendants from complying with the Consent Decrees and successive Orders in the "Yonkers case" (*United States of America v. Yonkers*, 80 Civ 6761 (LSB)) until the defendants have performed environmental studies in compliance with the National Environmental Policy Act of 1969 and the Housing and Community Development Act of 1974.

The action is now before the Court on certain defendants' motion to dismiss for lack of standing, on plaintiff's motion to amend his complaint, and on plaintiff's motion for a preliminary injunction.

### I *Background*

This action focuses on the environmental component of the *Yonkers* litigation, whose history has been recounted on several occasions, *see*, most recently, *Spallone v. United States*, — U.S. —, 110 S.Ct. 625, 628–31, 107 L.Ed.2d 644 (1990), and need not be recited in detail here.[1] It is sufficient for present purposes to state that, in 1985, the City of Yonkers was found liable for intentionally engaging in a pattern and practice of housing discrimination, in violation of Title VIII of the Civil Rights Act of 1968, 42 U.S.C. § 3601 *et seq.*, and the Equal Protection Clause of the Fourteenth Amendment. *United States v. Yonkers Board of Education*, 624 F.Supp. 1276 (S.D.N.Y.1985). In essence, the City and the Yonkers Community Development Agency were found to have caused and perpetuated residential racial segregation over a period of three decades by restrict-

---

1. Judge Sand of this Court, who is presiding over the *Yonkers* litigation, recused himself from the captioned action.

ing the construction of low-income housing projects to areas of the city that were mostly populated by minorities, in particular Southwest Yonkers. At present, there exists a concentration of 6,566 units of low-income housing, or 96.6% of all of the City's subsidized housing, in Southwest Yonkers. *United States v. Yonkers Board of Education*, 837 F.2d 1181, 1237 (2d Cir. 1987).

In 1986, this Court entered a Housing Remedy Order. *United States v. Yonkers Board of Education*, 635 F.Supp. 1577 (S.D.N.Y.1986). Following a long series of judicial proceedings, that housing remedy now mandates the development of approximately 4,200 units of low-income housing to be located in non-minority areas of Yonkers, specifically east of the Saw Mill River Road and north of Glenwood Avenue. *See* Guidelines for Implementing Long–Term Housing Order, Exhibit C to Amended Complaint at bar; Federal Defendants' Memorandum at 1; FHIO Defendants' Memorandum at 4. The housing will consist of: (1) 200 units of public housing east of the Saw Mill River Parkway subsidized with funds made available by HUD under the United States Housing Act of 1937; and (2) approximately 4,000 units of long-term low-income units, of which 3,200 would be market rate units and 800 would be assisted units. The 4,000 units are in part to be developed under a City ordinance conditioning the construction of new housing on the inclusion of at least 20% assisted units for low-income persons and in part to be subsidized with funds made available by HUD to the Fair Housing Implementation Office ("FHIO") under the Community Development Block Grant.

At this point in time, HUD has identified seven sites for the construction of the 200 units of public housing. According to plaintiff D'Agnillo, HUD was scheduled to approve the construction plans and to firmly commit funding for the construction of the first 142 units of public housing on March 26, 1990. D'Agnillo's papers also indicate that the parties to the *Yonkers* litigation are presently reviewing sites for the long-term construction projects; however, according to HUD, no specific proposal has been approved by the City of Yonkers or considered by HUD for approval. Federal Defendants' Memorandum at 13.

In light of its responsibility for developing public housing, HUD has performed seven separate environmental assessments for the seven separate public housing projects. HUD has concluded in each case that the projects will have no significant impact on the environment and has accordingly prepared seven separate "Findings of No Significant Impact." *See* Exhibits H through N attached to Federal Defendants' Memorandum. In addition, in reviewing each individual site, HUD has determined that there are no conditions "which require the assessment of cumulative impacts." *See id.*

On August 21, 1989, plaintiff *pro se*, John D'Agnillo, filed this action for declaratory and injunctive relief to enforce the provisions of the National Environmental Policy Act of 1969 ("NEPA") and of the Housing and Community Development Act of 1974 ("HCDA") with regard to the construction of housing ordered pursuant to the *Yonkers* litigation. The relief requested by plaintiff is:

a) a Declaratory Judgement that the National Environmental Policy Act of 1969 and other related laws and rules are applicable to the construction of the 4200 or more housing units ...

b) a Declaratory Judgement that the Housing and Community Development Act of 1974 requires the submission to HUD of a Housing Assistance Plan, properly voted upon and approved by the City Council of Yonkers, before funds can be allocated and transferred to the City by HUD as Community Development Block Grant funds;

c) preliminarily and permanently enjoin HUD ... from any further activities with respect to the construction and/or development, of any housing in the City of Yonkers until the above-cited and related environmental laws and rules are observed and obeyed and the requirements of the HCDA are properly complied with and fulfilled;

d) require HUD and the other Defendants to affirmatively carry out all of the studies, issue all of the reports, and follow through on all of the activities and procedures in accordance with all applicable federal, state, and municipal laws ...

Complaint at p. 7–8.

The "federal defendants" (HUD, Jack Kemp, Secretary of HUD, and Sam R. Moseley, New York Regional Administrator of HUD) and the "FHIO defendants" (the Fair Housing Implementation Office of the City of Yonkers, created to implement Judge Sand's remedial order, and Karen Hill, Director of the FHIO) have moved to dismiss the action. They argue that D'Agnillo's complaint does not adequately allege standing. The "Yonkers' defendants" (the Municipal Housing Authority for the City of Yonkers ("MHA"), Emmett Burke, Chairman of MHA, the City of Yonkers, and the individual Yonkers' defendants) have filed answers to the complaint. In its answer, the City of Yonkers essentially agrees with plaintiff that a comprehensive environmental impact study should be performed "so long as the ... studies can be conducted without interfering with the implementation schedule for the remedy orders of Judge Leonard Sand." Yonkers' Amended Answer at p. 4.[2]

D'Agnillo has responded by opposing the motion to dismiss or, in the alternative, moving to amend his complaint. In addition, D'Agnillo has moved for a preliminary injunction to stop the construction of any public or assisted housing.

## II Statutory and Regulatory Provisions

### (a) The NEPA Claim:

In 1969, Congress enacted a comprehensive environmental statute, the National Environmental Policy Act ("NEPA" or the "Act"). 42 U.S.C. § 4321 et seq. The purposes of the Act are:

To declare a national policy which will encourage productive and enjoyable harmony between man and his environment;

to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; to enrich the understanding of the ecological systems and natural resources important to the Nation; and to establish a Council on Environmental Quality.

42 U.S.C. § 4321.

The cornerstone of the Act, Section 102, provides that all agencies of the Federal Government shall include in every proposal for "major Federal actions significantly affecting the quality of the human environment" a detailed statement of the environmental impact of the proposed action. This statement is known as an Environmental Impact Statement or "EIS". 42 U.S.C. § 4332(2)(C) ("Section 102(2)(C)").

The Council on Environmental Quality; ("CEQ"), created under NEPA and charged with the responsibility to oversee the execution of the Act, has promulgated regulations that implement Section 102(2) of the Act. 40 CFR § 1500 et seq.

The regulations provide that, where the Federal action is not one that either does or does not normally require an EIS, the agency shall prepare an "environmental assessment" or "EA". 40 CFR § 1501.4(b). An environmental assessment is defined as:

a concise public document for which a Federal agency is responsible that serves to:

(1) Briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact.

(2) Aid an agency's compliance with the Act when no environmental impact statement is necessary ...

40 CFR § 1508.9(a)(1). In preparing an EA, the agency "shall involve environmental agencies, applicants, and the public, to the extent practicable." 40 CFR § 1501.4(b). The resulting document must include "brief discussions of the need for the proposal, of alternatives as required by

---

**2.** By subsequent resolution adopted by the City Council of the City of Yonkers on January 9, 1990, the Yonkers' defendants have taken the position that "an environmental assessment of the entire housing plan is required." Statement of Position of the City of Yonkers at page 4.

section 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted." 40 CFR § 1508.9(b).

The purpose of the environmental assessment is for the agency to determine whether the federal action is likely to significantly affect the environment and, therefore, whether it must prepare an EIS. 40 CFR § 1501.4(c).

The concept of "major" federal action is separate from the notion of "significantly" affecting the environment. *Hanly v. Mitchell*, 460 F.2d 640, 644 (2d Cir.1972), *cert. denied*, 409 U.S. 990, 93 S.Ct. 313, 34 L.Ed.2d 256 (1972). The Court indicated in *Hanly* that the term "major Federal action" refers to "the cost of the project, the amount of planning that preceded it, and the time required to complete it, but does not refer to the impact of the project on the environment." *Id.; United Neighbors Civic Association of Jamaica v. Pierce*, 563 F.Supp. 200, 206 (E.D.N.Y.1983).

If the agency determines that the proposed action is not "major federal action significantly affecting the environment," it must instead prepare a finding of no significant impact ("FONSI"). 40 CFR § 1501.4(e). A FONSI is defined as:

a document by a Federal agency briefly presenting the reasons why an action ... will not have a significant effect on the human environment and for which an environmental impact statement therefore will not be prepared. It shall include the environmental assessment or a summary of it and shall note any other environmental documents related to it.

40 CFR § 1508.13. "Effect" is meant to include both direct effects and indirect effects that are "later in time or farther removed in distance, but are still reasonably foreseeable." 40 CFR 1508.8.

While the regulations do not specifically address how an agency is to determine the appropriate scope of an EA, some guidance may be found in the provisions that relate to the scope of EIS's. When actions are "connected" or "cumulative," they should be discussed in the same EIS. Actions are "connected" if they:

(i) Automatically trigger other actions which may require environmental impact statements.

(ii) Cannot or will not proceed unless other actions are taken previously or simultaneously.

(iii) Are interdependent parts of a larger action and depend on the larger action for their justification.

40 CFR § 1508.25(a)(1). Actions are "cumulative" if "when viewed with other proposed actions have cumulatively significant impacts." 40 CFR § 1508.25(a)(2).

In addition, when actions are "similar," the agency may be advised to consider the actions in one EIS:

Similar actions, which when viewed with other reasonably foreseeable or proposed agency actions, have similarities that provide a basis for evaluating their environmental consequences together, such as common timing or geography. An agency may wish to analyze these actions in the same impact statement. It should do so when the best way to assess adequately the combined impacts of similar actions or reasonable alternatives to such actions is to treat them in a single impact statement.

40 CFR § 1508.25(a)(3). The Supreme Court has read this provision to require that "when several proposals ... that will have cumulative or synergistic environmental impact upon a region are pending concurrently before an agency, their environmental consequences must be considered together." *Kleppe v. Sierra Club*, 427 U.S. 390, 410, 96 S.Ct. 2718, 2730, 49 L.Ed.2d 576 (1976).

The CEQ has directed federal agencies to establish their own procedures to identify those actions requiring EIS's. 40 CFR § 1500.3(a). Accordingly, the Department of Housing and Urban Development ("HUD") has promulgated regulations which "provide[ ] supplemental instructions to reflect the particular nature of HUD programs, and [are] to be used in tandem with 40 CFR Parts 1500–1508." 24 CFR § 50.1(b).

HUD's policy—like that of the CEQ—is "to reject proposals which have significant adverse environmental impact and to encourage the modification of projects in order to enhance environmental quality and minimize environmental harm." 24 CFR § 50.3(a). HUD has emphasized that "[e]nvironmental impacts shall be evaluated on as comprehensive a scale as is practicable." 24 CFR § 50.3(e).

The HUD regulations require that "[a]n EA and FONSI or EIS for individual projects shall be completed" before a decision is made to construct new public housing or to grant CDBG funds. 24 CFR § 50.17(a)(3) and (e). These regulations, in contrast to the CEQ regulations, address the scope of the environmental review. Under the subject-heading "aggregation," the regulations provide:

> (a) Individual actions which are geographically related and are logical parts of a composite of contemplated actions shall be evaluated together. For example, under the following conditions, a single review shall be done:
>
> (1) When an applicant's project is part of an uncompleted portion of a development plan prepared for a private entity and approved by the locality, the evaluation shall include the number of units in the uncompleted portion; or
>
> (2) When an applicant's project is a portion of a larger site over which private land use control is centralized, the evaluation shall include the uncompleted portion of the total site.

24 CFR § 50.21(a).

The HUD regulations also provide that an EIS shall be prepared for, *inter alia*, a proposal "which would result in the construction or installation of 2,500 or more housing units, or which would provide sites for 2,500 or more housing units." 24 CFR 50.42(b)(3).

(b) *The HCDA Claim:*

The Housing and Community Development Act ("HCDA" or the "Housing Act") was enacted in 1974 to promote the development of "decent housing and a suitable living environment ... principally for per- sons of low and moderate income." 42 U.S.C. § 5301(c). The principal vehicle of the Act is the Community Development Block Grant Program ("CDBG"), which provides federal subsidies to States and local governments for the construction of low-income housing.

One of the conditions imposed on recipients of CDBG funds is that the local government "certifies that it is following a current housing assistance plan which has been approved by the Secretary [of Housing and Urban Development]." 42 U.S.C. § 5304(c)(1). This plan, otherwise known as a "HAP", shall assess the housing assistance needs of low-income persons, set realistic goals for the provision of housing to meet those needs, and indicate the general locations of proposed low-income housing. 42 U.S.C. § 5304(c)(1)(A), (B) and (C). In addition, the Housing Act directs recipients to comply with the policies of NEPA under procedural regulations to be promulgated by HUD. 42 U.S.C. § 5304(g)(1).

### III *Discussion*

#### A Motion to Dismiss

Federal defendants move this Court to dismiss D'Agnillo's complaint pursuant to Rule 12(b)(1), Fed.R.Civ.P., for lack of subject matter jurisdiction. They contend that D'Agnillo lacks standing because the complaint nowhere alleges an injury in fact. FHIO defendants also move to dismiss for failure to allege standing. D'Agnillo responds that his complaint "sets forth incontrovertible facts which clearly demonstrate that anyone, such as himself, who resides within the affected [sic] three quadrants of the City of Yonkers, has been and will be injured by a failure to carry out a proper environmental review." Plaintiff's Memorandum at p. 1. In the alternative, D'Agnillo moves for leave to submit an amended complaint detailing his injuries pursuant to Rule 15, Fed.R.Civ.P.

Limitations on standing to sue derive from two sources, constitutional and prudential. *Warth v. Seldin*, 422 U.S. 490, 498–99, 95 S.Ct. 2197, 2204–05, 45 L.Ed.2d 343 (1975). As a matter of constitutional law, Article III limits the jurisdiction of the federal courts to actual cases and contro-

versies. Thus, where a plaintiff lacks constitutional standing, a federal court has no subject matter jurisdiction. *In Re. Catholic Conference,* 885 F.2d 1020 (2d Cir.1989). Secondly, as a matter of judicial self-governance, "the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin, supra,* 422 U.S. at 499, 95 S.Ct. at 2205.

In order to establish constitutional standing, the plaintiff carries the burden of alleging facts that demonstrate: (1) that he "personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant"; (2) that the injury "fairly can be traced to the challenged action of the defendant"; and (3) that the injury "is likely to be redressed by a favorable decision." *Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982). Once constitutional standing has been determined, the courts must ensure that they are not being "called upon to decide abstract questions of wide public significance even though other governmental institutions may be more competent to address the questions and even though judicial intervention may be unnecessary to protect individual rights." *Warth, supra,* 422 U.S. at 500, 95 S.Ct. at 2206.

▪▪▪ In his original complaint, D'Agnillo states only that his interests and those of other citizens of Yonkers are "within the zone of interests intended to be protected by [NEPA and HCDA]" because they are residents of the areas involved in the *Yonkers* litigation; and that they "are being injured in fact by the defendants' failure to prepare an EIS." Complaint ¶ 19.

These allegations are plainly insufficient to establish standing. *See United States v. Students Challenging Regulatory Agency Procedures,* 412 U.S. 669, 688–89, 93 S.Ct. 2405, 2416–17, 37 L.Ed.2d 254 (1973). However, it is equally clear that the amendments D'Agnillo proposes to his complaint set forth facts that establish standing.

In his amended complaint, D'Agnillo alleges that many of the city-owned parcels under review for the proposed housing are in close proximity to his home—in fact, plaintiff has listed fourteen such sites under consideration. Amended Complaint ¶ 20. D'Agnillo claims that the construction would increase "the population density and cause increased traffic, resulting in greater air and noise pollution which will be injurious to plaintiff's health as plaintiff's daily neighborhood walks will be adversely affected." *Id.* In addition, plaintiff complains of the reduction of parkland given that several of the proposed sites are parks. Amended Complaint ¶ 20–21. D'Agnillo also alleges that the Yonkers sewer system, the "Yonkers Joint Wastewater Treatment Plant" or "YJWTP", is operating above its rated capacity and that the State has imposed a moratorium on new sewer hook-ups in the areas serviced. Amended Complaint ¶ 22. Plaintiff contends that the construction of additional sewer hook-ups would injure him "if, due to the inability of the YJWTP to handle the increased raw sewage, the YJWTP will be forced to periodically discharge untreated sewage into the Hudson River, polluting the water, causing a health hazard to Plaintiff as well as others, or ... by being prevented from flushing his toilet on the basis of need and rather being required to flush on a schedule set forth in another Ordinance." *Id.*

The amended complaint plainly alleges injury in fact and therefore satisfies the constitutional requirements of standing. In addition, D'Agnillo is not raising abstract questions, but is rather complaining of environmental consequences that may affect him directly. Given that D'Agnillo is proceeding *pro se,* I grant plaintiff's motion to amend his complaint. *Cf. Haines v. Kerner,* 404 U.S. 519, 520–21, 92 S.Ct. 594, 595–96, 30 L.Ed.2d 652 (1972) (per curiam) (*pro se* complaint should not be held to as rigorous a standard as formal pleadings prepared by an attorney).

*B Motion for Preliminary Injunction*

Plaintiff has moved for a preliminary injunction seeking to prohibit HUD from

"going forward with plans, approvals, acquisitions of sites, funding and construction" of the housing ordered in the *Yonkers* litigation. The federal defendants and the FHIO defendants oppose D'Agnillo's application, claiming that he has shown neither irreparable harm nor serious questions going to the merits of his case.

The rule in the Second Circuit is that a preliminary injunction may issue where a party makes a showing of (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief. *Warner Bros., Inc. v. Gay Toys, Inc.,* 658 F.2d 76, 78 (2d Cir.1981).

D'Agnillo's amended complaint raises three questions: (1) whether HUD should regard the plan to build 4,200 units as a single major Federal action significantly affecting the environment, (2) whether the agency should, alternatively, regard the 200 HUD units as a single major Federal action, and (3) whether HUD should have performed an EIS for each of the seven separate sites.[3]

With regard to the first question presented, the federal and FHIO defendants argue that NEPA does not require HUD to review the 4,200 units as one federal action at this point because neither HUD nor the FHIO have designated sites for the 4,000 market rate and assisted units. There is authority for that proposition. In *Nucleus of Chicago Homeowners Association v. Lynn,* 524 F.2d 225, 230 (7th Cir.1975), *cert. denied,* 424 U.S. 967, 96 S.Ct. 1462, 47 L.Ed.2d 734 (1976), the Court of Appeals for the Seventh Circuit ruled that HUD did not abuse its discretion by choosing to evaluate the environmental impacts of housing projects as they were proposed and approved.

In *Nucleus of Chicago,* the Court addressed a similar environmental challenge to the construction of low-income housing. There too, the housing was ordered to remedy past patterns of racial discrimination in the Chicago public housing market. The Chicago Housing Authority ("CHA") was ordered to construct 1500 units of low-income housing at scattered sites in predominantly white neighborhoods. 524 F.2d at 228. As an initial step to comply with the remedial order, the CHA and HUD began construction of an 84–unit scattered-site housing project. HUD conducted a special environmental clearance for the 84–unit project and issued a negative statement stating that the project posed no significant risk to the environment. *Id.*

Plaintiffs in *Nucleus of Chicago* brought suit seeking to enjoin construction of the housing, arguing that HUD had failed to perform an EIS assessing the sociological impact of the housing. As a preliminary matter, the Court dismissed plaintiffs' claim that HUD should have performed an environmental review of the 1500 units instead of assessing only the 84 units. The Court determined that this would not have been feasible and, therefore, was not required by NEPA. The Court explained:

> While a given action "may be more appropriately evaluated in a single environmental clearance," HUD is not compelled to aggregate several projects if, in its judgment, evaluation of the aggregate is not feasible.

> Indeed, comprehensive evaluation of specific environmental impact is not possible here. CHA had not selected and HUD had not tentatively approved 1500 proposed housing sites at the time the 84 unit environmental clearance was performed ... [T]hough we are cognizant of the benefits of comprehensive planning and do not intend to discourage such analysis, we cannot say that HUD

---

3. The claims under the Housing and Community Development Act are not yet ripe, since they involve only the long-term housing proposals that will be subsidized by Community Block Grants. As noted *infra,* no long-term proposals have been proposed yet. Federal Defendants' Memorandum at 15. In any event, the HCDA claims merge into the NEPA claims since the central thrust of plaintiff's HCDA claim is that defendants have not complied with the environmental requirements under the Housing Act. *See* 24 C.F.R. § 58.1 *et seq.* Because the claims merge, I will address plaintiff's environmental concerns under the NEPA rubric only.

has abused its discretion by choosing to evaluate the impact of CHA housing as housing sites are proposed and approved.

*Id.* at 230.

■ While this Court is not bound by Seventh Circuit authority, I find *Nucleus of Chicago* persuasive and am aware of no Second Circuit case to the contrary. Accordingly, I reject on the present record D'Agnillo's claim that HUD should have conducted a review of the aggregate environmental impact of the 4,200 units. Federal defendants represent that "no proposal for a single long-term project has yet been offered by any developer. Therefore, none of the critical factors to be considered in an environmental assessment, such as the location, size and type of housing, can be known at this time." Federal Defendants' Memorandum at p. 13. Plaintiff has failed to rebut this representation. Accordingly, plaintiff's claim that HUD should perform a single EIS for the 4,200 units is without merit.

However, the decision in *Nucleus of Chicago* does not address D'Agnillo's second theory of liability, namely that HUD should comprehensively review the environmental impact of the seven public housing sites. And the federal defendants fail to address this claim, stating instead that "[t]he plaintiff does not contend that the 200 units of public housing alone would have a cumulative environmental effect requiring the preparation of a full-scale environmental impact statement." Federal Defendants' Memorandum at 13 n. 4.

I cannot agree that plaintiff's complaint should be read so narrowly. The original complaint states that "[d]efendants in concert have undertaken to select sites for the 200 public housing units ... without the preparation of an EIS, in violation of 42 U.S.C. 4321, et seq., and its implementing provisions." Complaint ¶ 18. The amended complaint contains similar language. *See* Amended Complaint ¶ 18. Moreover, plaintiff's affirmation in support of preliminary relief also refers to the injury that plaintiff may sustain as the result of the construction of the 142 units of public

housing without the performance of an EIS. Affirmation ¶ 3.

To be sure, plaintiff's affirmation states that "[t]he various NEPA and HUD laws ... call for *one* Environmental Impact Statement covering *all* of the construction ordered by the Consent Decree of January 28, 1988 ... This single EIS is the relief the Plaintiff seeks and to which he believes he is entitled." Affirmation ¶ 7. But in his affirmation in reply, D'Agnillo argues that "[n]o consideration has been given to the significance of the impact of the seven sites taken together, or to their combination with the other 4000 units involved in the action at issue." Affirmation in Reply at ¶ 5; *see also id.* at ¶ 16. Thus, even if this second theory of liability was not readily apparent from the original complaint, it was expressly stated in the reply papers. Accordingly, I will not limit plaintiff to one theory of liability.

Moreover, federal defendants' general argument that the sites thus far proposed are not geographically or logically connected is entirely conclusory and begs the question. They allege that "[e]ach of the seven public housing projects to be built in Yonkers will be on a separate site which is geographically separate from any other public housing site." Federal Defendants Memorandum at 15. Defendants conclude that "[t]herefore, the projects are not related or closely connected in a geographical sense," because "[o]bviously, any specific environmental effect of one project is not shared by another project located blocks, or even miles, away." Federal Defendants' Memorandum at 12 and n. 3.

Defendants, however, are assuming the core issue of this litigation. It is by no means obvious that projects that are located only blocks away will not have a cumulative impact on the environment or are not connected for purposes of NEPA review. The purpose of an environmental review is precisely to investigate these very issues.

Plaintiff alleges that the proposals for public housing are "in close geographic proximity, at least four sites being within easy walking distance of each other." Affirmation in Reply ¶ 2. D'Agnillo claims

that the various sites have "unacceptable noise levels; requirements for new sewer hookups in spite of the moratorium on new sewer hookups declared by the New York State Department of Environmental Conservation; inaccessibility to shopping, transportation, social services, hospitals, etc.; located in already racially mixed areas; and one site even *requires* bus service in order to render it accessible, without any provision as to who will assume this liability." Affirmation ¶ 4 [4].

D'Agnillo has proffered some evidence in support of these allegations.[5] Nevertheless, it appears from the present record that HUD did not consider whether to evaluate the seven sites together. In addition, in evaluating the seven projects separately, HUD found in each instance that there were no conditions which require the assessment of cumulative impacts. The record is silent as to how the agency made this determination.

 The rule in the Second Circuit is that HUD's determination whether to prepare an EIS must stand unless the decision is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Hanly v. Kleindienst,* 471 F.2d 823, 830 (2d Cir. 1972), *cert. denied,* 412 U.S. 908, 93 S.Ct. 2290, 36 L.Ed.2d 974 (1973); *Nucleus of Chicago Homeowners Association v. Lynn,* 524 F.2d 225, 229 (7th Cir.1975). NEPA requires that the agency "affirmatively develop a reviewable administrative record supportive of a decision not to file an impact statement." *Id.* at 231. However, "the content and volume of such a record depend upon the particular federal action proposed. A concise statement may

be sufficient to support an agency finding of no significant environmental impact if it is grounded on supporting evidence." *Id.* (*citing Hanly v. Mitchell,* 460 F.2d 640, 646 (2d Cir.1972), *cert. denied,* 409 U.S. 990, 93 S.Ct. 313, 34 L.Ed.2d 256).

With regard to the scope of the environmental review required by NEPA, it is well settled that "[a]gencies may not evade their responsibilities under NEPA by artificially dividing a major federal action into smaller components, each without 'significant' impact." *Coalition on Sensible Transportation,* 826 F.2d 60, 68. The Second Circuit has written:

"Segmentation" or "piecemealing" occurs when an action is divided into component parts, each involving action with less significant environmental effects. Segmentation is to be avoided in order to "insure that interrelated projects[,] the overall effect of which is environmentally significant, not be fractionalized into smaller, less significant actions."

CEQ guidelines provide that proposals should be included in the same EIS if they are "connected," that is, if they are "closely related" such that they are "interdependent parts of a larger action and depend on the larger action for their justification." 40 C.F.R. § 1508.25(a)(1)(iii). The proper test to determine relatedness ... is whether the project has independent utility.

*Town of Huntington v. Marsh,* 859 F.2d 1134, 1142 (2d Cir.1988). And, as noted above, the HUD regulations require that "actions which are geographically related and are logical parts of a composite of

---

4. I will disregard D'Agnillo's complaint insofar as it questions whether the agency has adequately addressed the sociological impact of the housing projects. The law is clear that sociological impact is not cognizable under NEPA. *See Nucleus of Chicago, supra* at 231 ("[w]e think that type of [people pollution] affect cannot fairly be projected as having been within the contemplation of Congress"); *Maryland–National Cap. PK. & PL. Com'n v. U.S. Postal Serv.,* 487 F.2d 1029, 1037 (D.C.Cir.1973); 40 CFR § 1508.14 ("[h]uman environment" shall be interpreted comprehensively to include the natural and physical environment and the relationship of

people with that environment. This means that economic or social effects are not intended by themselves to require preparation of an environmental impact statement").

5. All parties agree, for instance, that Judge Sand has obtained for one of the seven public housing sites a special exemption from the temporary moratorium on further extensions to the City of Yonkers' sanitary sewers imposed by the New York State Department of Environmental Conservation. *See* Exhibit F to Federal Defendants' Memorandum.

contemplated actions shall be evaluated together." 24 CFR § 50.21(a).

■ In the case at bar, the present record is devoid of any evidence that HUD considered whether to review the seven sites together. The record also does not explain why HUD found no cumulative impact of the seven sites.[6] In addition, federal defendants' memorandum of law does not address plaintiff's claim that HUD should have reviewed the seven sites together or should have examined the cumulative effects of the projects. The memorandum does not address the relevant environmental regulations promulgated under NEPA and described at length in Part II of this Opinion.

Accordingly, based on the insufficiency of the present record, I reserve judgment on plaintiff's motion for a preliminary injunction. The defendants have not adequately addressed the applicability of the federal regulations to the proposal to build 200 units of public housing. The parties are directed to furnish additional affidavits and briefs on these issues and to attend a hearing on plaintiff's motion on May 9th, 1990.

## CONCLUSION

For the foregoing reasons, defendants' motion to dismiss the original complaint and plaintiff's motion to amend his original complaint are granted. I will deem the amended complaint served and filed as of the date of this Opinion. Defendants shall move or answer with respect to the amended complaint within twenty (20) days of their receipt of this Opinion.

It is further ordered that the parties file supplemental affidavits and briefs on the outstanding issues concerning the motion for a preliminary injunction. Specifically, I direct the parties:

(a) to describe the exact geographic location of the seven approved sites;

(b) to establish for the record whether and how HUD evaluated the possibility of comprehensively reviewing the seven sites;

(c) to establish for the record the basis of HUD's decision that there was no cumulative impact at each of the seven sites;

(d) to discuss whether the seven sites are geographically related and/or are logical parts of a composite of contemplated actions;

(e) to discuss the potential cumulative impact of the seven sites;

(f) to evaluate the agency's action or inaction in light of the relevant CEQ and HUD regulations;

(g) to discuss whether the agency should have evaluated the seven sites on a comprehensive basis; and

(h) to establish for the record the status of the long-term proposals, i.e. whether any sites are contemplated, have been reviewed, selected or approved.

Plaintiff, federal defendants and FHIO defendants shall each submit their respective supplemental memorandum on or before the close of business on May 1, 1990. The parties are further directed to attend a hearing on the motion for a preliminary injunction on May 9, 1990 at 4:30 p.m., at which they will be expected to argue their respective positions. There will be no extensions of time granted.

It is SO ORDERED.

---

**6.** HUD's apparent failure to state why there would be no cumulative impact from the seven sites also support's D'Agnillo's third theory of liability, namely that the seven separate environmental assessments were not performed in compliance with NEPA. This issue should be included in the parties' further briefing of the case.