**BLUE OCEAN PRESERVATION SOCIETY, a Hawaii non-profit corporation; Sierra Club, a California non-profit corporation; and Greenpeace Foundation, a Hawaii non-profit corporation, Plaintiffs,**

v.

**James D. WATKINS, Secretary Department of Energy, et al., Defendants.**

**Civ. No. 90–00407 DAE.**

United States District Court, D. Hawaii.

Jan. 8, 1991.

---

Paul Spaulding, III and Arnold Lum, Sierra Club Legal Defense Fund, Inc., Honolulu, Hawaii, for plaintiffs.

Daniel A. Bent, U.S. Atty., Linda J. Joachim, Asst. U.S. Atty., Honolulu, Hawaii, and Gary B. Randall, Atty., U.S. Dept. of Justice, Washington, D.C., for defendants.

ORDER DENYING DEFENDANT UNITED STATES' MOTION FOR SUMMARY JUDGMENT AND GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

DAVID A. EZRA, District Judge.

## I. Introduction

This is an action brought by three environmental groups ("Plaintiffs") seeking to compel the federal government to prepare an Environmental Impact Statement ("EIS") covering the development of geothermal energy on the Island of Hawaii (the "Big Island") before proceeding further with that development. Defendant federal departments and agencies (collectively the "Government") have moved for summary judgment on the grounds that Plaintiffs' claim is not ripe, and that this court therefore lacks subject matter jurisdiction. Plaintiffs have filed a cross-motion for partial summary judgment on the issue of whether the geothermal project constitutes "major federal action" within the meaning of 42 U.S.C. § 4332(2)(C). This motion presents a major question for resolution in this action.

## II. Factual Background

### A. The 4–Phase Hawaii Geothermal Project

In 1978, in order to encourage the commercial development of geothermal energy, the State of Hawaii, with the cooperation of Congress and the Department of Energy, began the Hawaii Geothermal Project (the "Project"). It was envisioned that the

Project would be carried out in four stages: (1) the Hawaii Geothermal Resource Assessment Program ("Phase I"), (2) the Hawaii Deep Water Cable Program ("Phase II"), (3) the Hawaii Geothermal Resource Verification and Characterization Program ("Phase III"), and (4) Construction of the Commercial Hawaii Geothermal Project ("Phase IV"). The Project was intended to provide large quantities of electric power,[1] generated by geothermal energy plants on the side of the Big Island's Kilauea volcano, and transported to the islands of Maui and Oahu via underwater and overland cable. The early phases were to be carried out primarily with public funds to remove the uncertainty and risk, and thereby encourage private investors to undertake the ultimate Project development (Phase IV).

Phase I was jointly funded by the State of Hawaii and the U.S. Department of Energy ("DOE"), with the federal government contributing $10.7 million, 80% of the total funding. It resulted in the drilling of one geothermal well and the establishment of a small 2.5 megawatt demonstration plant (recently closed down) in the Puna district on the Big Island. Phase I provided important data on the geothermal resource base and has now been completed.

Phase II, the Deep Water Cable Program, was a study of the feasibility of transmitting electricity via a submarine cable system from the Big Island to Maui and Oahu. The federal government provided over $24 million (83% of total cost) for the research, design, construction and routing of an undersea cable. This included not only generic cable development research, but also site-specific route surveys between the islands as well as actual test-laying of cable on site. At-sea tests have been fin-ished and this phase is essentially completed.

In conjunction with these first two phases of the Project, the Hawaii legislature has enacted a series of laws designed to further the Project, which it terms a "federal/state partnership effort." *See* the 1988 Act, discussed *infra* at Section II.B. These include laws granting favorable excise tax treatment to sellers of geothermal energy (1978–Act No. 135), designating geothermal subzones for development purposes (1983–Act No. 296), and granting agency authority to set geothermal royalty rates (1985–Act No. 138).

Phase III has now begun, with Congress having already appropriated $5 million of federal funds toward it. It involves the drilling of 25 commercial scale exploration wells throughout the Kilauea East Rift Zone to "verify" the geothermal resource. As a preliminary matter in this phase, two slim-bore scientific observation holes have, at state (not federal) expense, already been drilled. Completion of Phase III will clear the way and set forces in motion for the private construction of the full-scale 500 megawatt project, which is Phase IV.[2]

### B. The Geothermal and Cable System Development Permitting Act of 1988

In 1988, to further accelerate and facilitate the Project, the Hawaii legislature enacted the "Geothermal and Cable System Development Permitting Act" (the "1988 Act"), codified at H.R.S. §§ 196D–1, *et seq.* The 1988 Act is designed primarily to streamline the approval and permit process.

The 1988 Act defined the Project in terms of its ultimate goal (Phase IV), and

---

**1.** The Project clearly contemplates the provision of 500 megawatts of power (enough to meet half the power needs of the State of Hawaii). It is not clear from the record, however, whether this specific amount was projected from the beginning, or whether it was determined using the data gathered in Phase I.

**2.** Hawaii Governor John Waihee, in his formal request for federal funding for Phase III, characterized that phase as follows:

> Mr. Chairman, we are not asking for funding for just another study of renewable energy technology. Our proposal is for a resource verification program which will lead immediately to a full-scale private development of 500 megawatts of geothermal power.

Letter to J. Bennett Johnston, Chairman of Subcommittee on Energy and Water Development, June 19, 1989, p. 2.

specifically recognized the interdependence of its two fundamental components:

> (7) The *fundamental interrelationship between the development of geothermal resources and a cable system* and the magnitude of the cost to undertake each of these developments clearly indicate that *neither will be undertaken without the firm assurance that the other also will be undertaken in a synchronized and coordinated manner* to enable both developments in substance to be completed concurrently....

H.R.S. § 196D–2 (emphasis added).

In addition, the 1988 Act established the Interagency Group, a body with representatives from each agency deemed to have jurisdiction or permitting authority over some aspect of the Project. Under the statute, eight state agencies were represented and eight federal agencies (all of whom are named defendants) were invited to join the group. All eight accepted the invitation, and seven sent representatives to some or all of the meetings of the Interagency Group.[3]

The Interagency Group's mission is to consolidate and streamline the permitting process for the Project. The purpose is to overcome the daunting array of federal, state and local permits and processes that have discouraged potential commercial developers. The Group has compiled a master list of necessary permits, and it is expected that it will be involved in establishing a timetable for regulatory review, conducting necessary hearings, and consolidating governmental activities.

### C. The Extent of Federal Involvement in the Project

In addition to the contribution of federal funds, and the arguably significant role various federal agencies and officials have played as part of the Interagency Group, the federal government has been involved in the Project in a number of other ways.

As early as 1978, DOE contracted with a private consultant for a "Direct Use Overview for Hawaii and Total Use Scenario for Puna (HI)."[4] The purpose of the resulting report is stated in its Summary:

> As a means of accelerating the environmentally acceptable use of geothermal resources in the State of Hawaii, this report presents an overview of the potential for direct utilization (non-electric) in the state and a scenario for development to the year 2020 of the most promising prospect—Puna, on the Big Island of Hawaii.

This document, commissioned by DOE, sets forth a series of recommendations for the development of geothermal energy in the Puna district. It has provided groundwork and guidance for much of the Project.

DOE has provided planning and financial assistance in a number of actions aimed at driving commercial geothermal development forward, independent of its participation in the phases of the Project itself. Plaintiffs have submitted a list of 21 DOE-sponsored reports, funded by DOE contracts, that deal specifically with geothermal energy development *in Hawaii*. In addition, when the state passed legislation for the designation of resource subzones, DOE provided most of the funding for the necessary geothermal resource assessment and impact analysis.

More recently, Patricia Port, Regional Environmental Officer for the U.S. Department of Interior conducted two meetings in October 1989 and June 1990 with state officers and the National Park Service, the Fish and Wildlife Service, and the U.S. Geological Survey. These meetings monitored progress on the Hawaii Geothermal

---

**3.** The federal members of the Interagency Group are the U.S. Army Corps of Engineers, U.S. Pacific Fleet, U.S. Coast Guard, U.S. Geological Survey, U.S. Fish and Wildlife Service, National Marine Fisheries Service, National Park Service, and Environmental Protection Agency ("EPA"). The EPA has been unable to provide a representative because of a staffing shortage in its Honolulu office. It has, none-

theless, requested to be kept on board in a non-attending capacity and to be kept apprised of matters of interest to the Interagency Group.

**4.** The report bearing this title was prepared for DOE by Science Application, Inc., La Jolla, California, under Contract ET–78–C–03–1529, on January 12, 1979.

Project Master Plan, and were designed to share information on agency concerns so the Master Plan could be adjusted to mitigate such concerns and facilitate expeditious implementation. A third such meeting was scheduled for December 1990.

Additionally, it appears that every federal agency named as a defendant in this action will have some role in permitting the Project when it reaches Phase IV.

The Government's role in the Project has not gone unacknowledged. As already noted, in the 1988 Act, the Hawaii legislature described the Project as a "federal/state partnership." This "partnership" characterization of the Project has been echoed a number of times in various contexts.

The 1990 Proposal to Congress for funding for Phase III utilized the heading: "HAWAII GEOTHERMAL PROJECT: A Federal–State–Private Partnership Leading Toward Commercialization." That Proposal explained that "[a] government-private-partnership is ... necessary to prove the resource and allow private commercial development to go forward."

In May 1990 U.S. Senator Daniel Inouye sent a letter to one of his colleagues regarding the 1990 Proposal in which he stated that the total funding of Phase III would "be divided equally between the private sector and a *State and Federal government partnership.*" (Emphasis added.)

In January 1990, DOE held a hearing in Honolulu on "National Energy Strategies." At this meeting, the Director of Hawaii's Department of Business and Economic Development ("DBED") confirmed its request to DOE of $15 million (spread over three years in $5 million increments) for Phase III. The Director stated: "This is an excellent example of government money, *state and federal,* being used in a good way: as seed money to prepare the way for the private sector to do the project with reduced risk." At this hearing, the state made a specific plea for DOE's continued support of and participation in the Project.

This "continuation" theme is also reflected in the record. Governor Waihee, in letters to the House and Senate Appropria-

tion Committees, requested "continuation of the federal assistance for the Hawaii geothermal research and development project through the funding of [Phase III]." Similarly, the 1989 and 1990 Proposals ask that "the Federal government continue its support of the Hawaii Geothermal Project by joining the State and private developers in financing [Phase III]."

III. Summary Judgment Standards

■ Summary judgment is proper when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Retail Clerks Union, Local 648 v. Hub Pharmacy, Inc.,* 707 F.2d 1030 (9th Cir.1983). In ruling on a motion for summary judgment, this court views the facts and inferences in the light most favorable to the non-moving party. *Id.*

■ The moving party has the initial burden of "identifying for the court those portions of the materials on file in the case that it believes demonstrate the absence of any genuine issue of material fact." *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986)). If the moving party meets its burden, then the opposing party may not defeat a motion for summary judgment in the absence of any significant probative evidence tending to support his legal theory. *Commodity Futures Trading Comm'n v. Savage,* 611 F.2d 270, 282 (9th Cir.1979). The opposing party cannot stand on its pleadings, nor can it simply assert that it will be able to discredit the movant's evidence at trial. *See T.W. Elec.,* 809 F.2d at 630.

■ There is no genuine issue of fact if the opposing party fails to offer evidence sufficient to establish the existence of an element essential to that party's case. *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552. There is also no issue of fact if on the record as a whole, a rational trier of fact could not find in favor of the non-moving

party. *Taylor v. List,* 880 F.2d 1040, 1045 (9th Cir.1989).

## IV. Statutory Background—The National Environmental Policy Act ("NEPA")

Section 102(2)(C) of NEPA requires federal agencies to prepare and file an EIS before undertaking "major federal action significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). In *Baltimore Gas & Electric v. Natural Resources Defense Council,* 462 U.S. 87, 97, 103 S.Ct. 2246, 2252, 76 L.Ed.2d 437 (1982) the U.S. Supreme Court identified the twin aims of NEPA: (1) it obligates the agency " 'to consider every significant aspect of the environmental impact of a proposed action;' and (2) it ensures that the agency will inform the public that it has considered such environmental concerns in its decisionmaking process." (quoting *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 553, 98 S.Ct. 1197, 1216, 55 L.Ed.2d 460 (1978)). NEPA does not indicate the weight that should be given such environmental concerns. It requires "only that the agency take a 'hard look' at the environmental consequences before taking a major action." *Baltimore Gas,* 462 U.S. at 97, 103 S.Ct. at 2252.

This case raises issues concerning what prompts or triggers NEPA obligations, what is the proper scope of the EIS, and, most importantly at this stage in the proceedings, *when* an EIS is required and *when* can it be compelled by legal action.

## V. The Government's Summary Judgment Motion

The Government has moved for summary judgment on the grounds that the court lacks subject matter jurisdiction. Specifically, the Government contends that the suit to compel an EIS is moot with respect to Phases I and II since those are completed actions, and that it is unripe with respect to Phases III and IV because no specific proposal has been advanced for either of them.

A fundamental issue on the Government's ripeness argument is whether the Project can and/or should be treated as a single project for NEPA purposes. The Government's ripeness arguments presuppose that the Project is nothing but four separate, independent projects, each subject to a separate NEPA analysis. Plaintiffs' entire lawsuit, in contrast, presupposes that the several phases of the Project should be aggregated and that an EIS should issue for the Project as a whole.

The characterization of the Project is critical to this court's inquiry because the Government's contention that Plaintiffs' suit for an EIS is moot with respect to Phases I and II and unripe with respect to Phases III and IV makes sense only if the four phases are properly treated as separate actions under NEPA. If, as Plaintiffs contend, they are merely components of one "major federal action," Plaintiffs' suit to compel an EIS for that action is neither moot nor unripe. It would not be moot since so much of the Project remains to be done, and it would not be unripe since the Project has already been partially implemented.[5]

The court finds that there is insufficient evidence in the record to support a finding, at summary judgment, that the Project is and always was a single, integrated, action with a solitary purpose: the construction of a 500 megawatt geothermal plant in Puna. It is difficult to glean from the evidence presented just how clearly and specifically the latter phases were defined at the time Phase I was proposed and implemented in 1978. Accordingly, there remain issues of fact as to whether the Project was and is, in actuality, a single project with a single goal, or whether it began as mere background research projects that did not ripen into a proposal for a full-scale geothermal energy plant until sometime later. This issue cannot, therefore, be resolved by summary judgment.

Even accepting the Government's contention that the four separate phases of the Project are distinct actions, however, the court nonetheless finds that the Govern-

---

**5.** *See* discussion of the "proposal" requirement *infra* at Section V.C.1.

ment is not entitled to summary judgment. The reasoning is set forth below.

### A. The Four Phases As "Connected Actions"

Even if the four phases of the Project are considered separate actions triggering separate NEPA obligations, those four actions (or phases) are sufficiently "connected" to require that they all be evaluated in a single EIS.

■ The regulation that governs the scope of EISs specifically provides for the consideration of:

(1) Connected actions, which means that they are closely related and therefore should be discussed in the same impact statement. Actions are connected if they:

(i) Automatically trigger other actions which may require environmental impact statements.

(ii) Cannot or will not proceed unless other actions are taken previously or simultaneously.

(iii) Are interdependent parts of a larger action and depend on the larger action for their justification.

40 CFR § 1508.25(a).

Although the three subsections are connected by neither "and" nor "or," it appears that they should be read in the disjunctive rather than the conjunctive. They are separated by periods, suggesting that each or any of the three criteria should be sufficient, standing alone, to make the actions "connected." The case law interpretations of the regulation have been consistent with this, having treated the separate subsections as sufficient conditions, not necessary conditions. *Hudson River Sloop Clearwater v. Dept. of Navy*, 836 F.2d 760, 763 (2d Cir.1988) (noting that "[o]nly subdivisions (ii) and (iii) are at issue here," and then proceeding to analyze the applicability of those subdivisions); *Town of Huntington v. Marsh*, 859 F.2d 1134, 1142 (2d Cir.1988) (finding the actions to be

connected based solely on the satisfaction of subdivision (iii)) (citing *Save the Yaak Committee v. Block*, 840 F.2d 714, 719 (9th Cir.1988)).

In this case, subsection (i) clearly does not apply, subsection (ii)'s applicability is arguable, and subsection (iii) appears to contemplate these facts precisely. The latter two provisions will be discussed in turn.

### 1. Connected Actions Under Subsection (ii)

*Actions are connected if they:*

. . . .

*(ii) Cannot or will not proceed unless other actions are taken previously or simultaneously.*

*40 CFR § 1508.25(a)(1).*

Under subsection (ii), it seems clear that Phase IV could never proceed unless Phases I–III were undertaken previously. Thus, subsection (ii) arguably applies. The Second Circuit has suggested, however, that the proper inquiry under (ii) is not whether the more remote action can proceed absent the more immediate action, but rather whether the more immediate action can proceed absent the remote action.[6]

In *Hudson River Sloop Clearwater v. Dept. of Navy*, 836 F.2d 760 (2d Cir.1988), conservation groups sued to stop development of a Navy battleship homeport until the Navy filed an EIS that also considered the accompanying proposal for the construction of housing to serve the homeport. The court observed:

> With respect to subdivision (ii), the district court concluded that the actions in this case are connected because the "construction of the family housing will not proceed unless the operational aspects of the homeport are built." We deem the issue presented, however, to be whether the converse is true. In other words, will the operational aspects of the homeport proceed without the construction of family housing?

6. In this case, the immediate action is Phase III, the action currently being proposed. The more remote action is Phase IV. It is a different question to ask whether implementation of Phase III is a necessary precondition for Phase IV than to ask whether implementation of Phase IV is a necessary precondition for Phase III.

836 F.2d at 763. Concluding that the homeport would proceed whether or not the housing project could be approved, the court ruled that, under subsection (ii), the two actions were not connected.[7]

Following the Second Circuit, the issue is not whether Phase IV could go forward without Phases I–III, but rather whether the earlier Phases could go forward without Phase IV ever being implemented. When characterized this way, it seems clear that the answer is yes. Indeed, Phases I and II have already been completed without any guarantee that Phase IV will ultimately be implemented. Moreover, the actual language of subsection (ii) suggests that it has *no* applicability when the more remote action *follows* the more immediate action:

> Actions are connected if they:
>
> . . . .
>
> (ii) Cannot or will not proceed unless other actions are taken *previously* or *simultaneously.*

40 CFR § 1508.25(a)(1) (emphasis added). Under this characterization, the various phases would not be "connected actions" under subsection (ii).

It is clear, however, that the two major components of the Project, the cable construction and the geothermal power plant construction, *are* necessary to each other. The 1988 Act stated:

> (7) The *fundamental interrelationship between the development of geothermal resources and a cable system* and the magnitude of the cost to undertake each of these developments clearly indicate that *neither will be undertaken without the firm assurance that the other also will be undertaken in a synchronized and coordinated manner* to enable both developments in substance to be completed concurrently. . . .

H.R.S. § 196D–2 (emphasis added). In a sense, therefore, the work related to either of those components "will not proceed" unless there is development of the other com-

ponent. This argument, somewhat strained under the language of subsection (ii), is more squarely advanced as an application of subsection (iii), *infra.*

### 2. *Connected Actions Under Subsection (iii)*

> *Actions are connected if they:*
>
> . . . .
>
> *(iii) Are interdependent parts of a larger action and depend on the larger action for their justification.*

*40 CFR § 1508.25(a)(1).*

This provision describes the facts before the court accurately. Phases I–III appear to have been conceived for the sole purpose of bringing about Phase IV, and depend on Phase IV and each other for their justification.

Although the Ninth Circuit has never *explicitly* relied on subsection (iii) in finding actions to be connected for NEPA purposes, it has repeatedly applied a virtually identical standard. It has, for example, specifically defined the interdependence that must exist between the various phases of a larger project if they are to be deemed connected:

> The dependency is such that it would be irrational, or at least unwise, to undertake the first phase if subsequent phases were not also undertaken.

*Save the Yaak Committee v. Block,* 840 F.2d 714, 719–20 (9th Cir.1988) (quoting *Trout Unlimited v. Morton,* 509 F.2d 1276, 1285 (9th Cir.1974)). The standard has been alternatively stated (as applied to a highway project) as follows:

> [T]he environmental impacts of a single highway segment may be evaluated separately from those of the rest of the highway only if the segment has "independent utility."

*Thomas v. Peterson,* 753 F.2d 754, 759 (9th Cir.1985) (summarizing the holding of *Daly v. Volpe,* 514 F.2d 1106, 1110 (9th Cir. 1975)); *see also Fritiofson v. Alexander,* 772 F.2d 1225, 1242 (5th Cir.1985) (" 'Con-

---

7. *Hudson River Sloop* cites *Thomas v. Peterson,* 753 F.2d 754, 758–59 (9th Cir.1985) as an application of subsection (ii), observing that it found connectedness where *both* actions are necessary preconditions to the other. This court believes *Thomas* is better characterized as an application of subsection (iii), discussed *infra.*

nected actions' are defined in a manner consistent with the criteria recognized in the independent-utility cases.").[8]

The Ninth Circuit elaborated on the application of this "independent utility" test in *Thomas v. Peterson,* 753 F.2d at 759–60:

> In the light of *Trout Unlimited,* the phrase "independent utility" means utility such that the agency might reasonably consider constructing only the segment in question.

In *Thomas,* there were two proposals: one for timber harvesting and sales, and another for construction of a road into the area to be harvested. The Ninth Circuit ruled that because the harvesting could not be done without construction of the road, and because the road did not have any significant utility other than to facilitate the harvesting, NEPA required a single EIS covering both the road and the timber sales. *Id.; see also Morgan v. Walter,* 728 F.Supp. 1483, 1493 (D.Idaho 1989) (David A. Ezra, District Judge) (Proposed diversion of river and proposed fish propagation facility are "connected actions" because "the fish propagation facility could not exist absent a diversion" and because the diversion was proposed for the purpose of facilitating fish propagation.).

On the facts before this court, Phases I–III do not possess any real independent utility. If Phase IV were not a possibility, it would clearly be "irrational, or at least unwise" to proceed with Phases I–III. *Trout Unlimited,* 509 F.2d at 1285. The Government could not "reasonably consider" going ahead with the deep water cable research and construction if there were no geothermal energy development to utilize the cable. *Thomas,* 753 F.2d at 760. Neither would the geothermal energy be developed if there were no cable project to convey the power generated. *See* the 1988 Act, H.R.S. § 196D–2. The facts of *Thomas*—timber project and access road—are analogous. Most significantly, there is no "independent utility" to the drilling of 25 commercial size wells to "verify" a geothermal resource (Phase III); that action is "irrational" absent imminent construction of a geothermal power plant (Phase IV).

Accordingly, even if the Project is properly characterized as four separate phases, the court would hold that those four phases are "connected actions" under NEPA regulations, and should be the subject of a single EIS.[9]

## B. *Mootness*

█ Even though the actions are connected, Phases I and II have already been completed. Any attempt to have those actions considered in a comprehensive EIS is, therefore, moot.[10]

█ As discussed above in Section IV, NEPA's function is to assure that adequate information is provided at the decision-making stage on a proposed action.

> [T]he basic function of an EIS is *to serve as a forward-looking instrument* to assist in evaluating "proposals" for major federal action....

---

**8.** The Second Circuit has affirmatively acknowledged that this "independent utility" test is merely an application of subsection (iii). *See e.g. Town of Huntington v. Marsh,* 859 F.2d 1134, 1141–42 (2d Cir.1988) ("The proper test to determine relatedness under 40 CFR § 1508.25(a)(1)(iii) is whether the project has independent utility."); *Hudson River Sloop Clearwater v. Dept. of Navy,* 836 F.2d 760, 764 (2d Cir.1988) ("[S]ubdivision (iii) has been determined to mirror a line of cases which hold that the proper test for interdependence is one of independent utility.").

**9.** Given the mootness of Phases I and II, *see infra* Section V.B., this finding of connectedness is effective only as to the remaining actions, Phases III and IV.

**10.** Phase I was the subject of an environmental assessment (EA) under NEPA, the adequacy of which was challenged in *Puna Speaks v. Edwards,* 554 F.Supp. 117 (D.Haw.1982) (finding the EA to comply with the statute, and refusing to compel an EIS). In order to compel an EIS considering all four phases, Plaintiffs should have challenged the adequacy of the EA for Phase I, arguing that the remaining three phases were "connected actions." Plaintiffs in this case were not parties to the *Puna Speaks* action, and it does not appear from the opinion that any "connected action" argument was raised at that time.

*National Wildlife Fed. v. Appalachian Reg. Commission*, 677 F.2d 883, 889 (D.C. Cir.1981) (quoting *Aertsen v. Landrieu*, 637 F.2d 12, 19 (1st Cir.1980) (citing *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n. 20, 96 S.Ct. 2718, 2730 n. 20, 49 L.Ed.2d 576 (1975))) (emphasis supplied by the *Appalachian* court).

Where the decision has already been made and carried out, and the action taken cannot be undone, there is absolutely no function or role for an EIS. Any suit to compel an EIS at that point is, perforce, moot. *Sierra Club v. Penfold*, 857 F.2d 1307, 1317–18 (9th Cir.1988) (suit challenging mining operations; the suit for an EIS is moot because "no adequate remedy exists.... [A] completed mining project cannot be moved," distinguishing *Columbia Basin Land Protection Assoc. v. Schlesinger*, 643 F.2d 585, 591 n. 1 (9th Cir.1981) (suit over placement of power lines is not moot since the court could order that the power line be moved)); *see also Friends of the Earth, Inc. v. Bergland*, 576 F.2d 1377, 1378–79 (9th Cir.1978) (claim is moot because the challenged mining project ended before the appeal was heard); *Ogunquit Village Corp. v. Davis*, 553 F.2d 243, 246–47 (1st Cir.1977) (courts cannot provide post-completion relief under NEPA).

Thus, whatever EIS might ultimately be ordered if Plaintiffs are successful in this suit can be directed only toward the remaining work to be done.

> [W]hen a NEPA challenge is leveled against some subsequent phase of a continuing federal action, the EIS obligation attaching at the latter point is realistically qualified by the elements of the program already in place. This limitation simply confines NEPA's mandatory decisionmaking input to programs posing options that may still freely be chosen.

*Appalachian*, 677 F.2d at 890. The actions taken in Phases I and II are complete and cannot be made the subject of any EIS; rather their effects should be incorporated into the background "data base" for assessment of the phases still at issue. *See Coalition on Sensible Transp., Inc. v. Dole*, 826 F.2d 60, 70 (D.C.Cir.1987).

## C. Ripeness

As to the remaining phases, the Government contends that there is no proposal yet before it, and that the suit to compel an EIS is therefore unripe. Coupled with this contention is the Government's promise that the appropriate environmental assessment will be done for Phase III before that project is undertaken. These alternative, if somewhat inconsistent, arguments will be considered in turn.

### 1. The Proposal Requirement—Triggering the NEPA Duty

■ It is now well settled that an EIS cannot be required unless and until a "proposal" is made. *Kleppe v. Sierra Club*, 427 U.S. 390, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1975). In *Kleppe*, the Department of Interior was involved in leasing government property to be mined, and the Sierra Club sought to compel an EIS for the entire region then being leased. The Court of Appeals found that the Department "contemplated" a regionwide plan or program, even though its only activity had been the entering of individual leases, and ordered that an EIS be prepared. The Supreme Court reversed, saying that the statute does not require an EIS until an agency makes a report or recommendation on a *proposal*. Whether or not regionwide action was contemplated, there was no *proposal* for such regionwide action, and the EIS could not be compelled. *See also Aberdeen & Rockfish R. Co. v. SCRAP*, 422 U.S. 289, 320, 95 S.Ct. 2336, 2356, 45 L.Ed.2d 191 (1974) ("[T]he time at which the agency must prepare the final [environmental impact] 'statement' is the time at which it makes a recommendation or report on a *proposal* for federal action.") (emphasis in original); *B.R.S. Land Investors v. United States*, 596 F.2d 353, 355 (9th Cir. 1979) (utility applied for federal approval for high-tower power lines over federal land; although there had been "preliminary discussions" on the application, there was no federal action sufficient to trigger NEPA).

Despite its attempt to establish a brightline test, the *Kleppe* decision does not dic-

tate a clear conclusion in this case. One commentator has observed:

> The Supreme Court's decision in *Kleppe* leaves many questions unanswered. The Court stated that NEPA requires a "precise" decision on whether an agency has "proposed" an action, but it did not define "proposal." ....

Mandelker, *NEPA Law & Lit.* § 8:13 (1990). Indeed this fact pattern does not seem to fit within the parameters contemplated by *Kleppe* or by any other reported decision.

In the more typical scenario, a federal agency considers a private proposal, then issues a report or recommendation on it before the proposed action is taken. *Kleppe* and its progeny clearly establish that the EIS must be completed at the time such report or recommendation is made. If Congressional action is required, the proposal, the report or recommendation, and the EIS all go to Congress for consideration.

In this case, however, the proposal was submitted directly to Congress, and DOE did not issue a report or recommendation on it. DOE's failure to issue such a report or recommendation has already frustrated to some degree NEPA's purposes in that Congress acted on the proposal without being advised or informed of its potential environmental impact. The Government now argues that it may use the appropriated funds to contract for the work comprising Phase III before it can be compelled to look at the environmental consequences of that action.

This approach appears to be in conflict with NEPA's clear intent, as interpreted by the accompanying regulations:

> The [environmental impact] statement shall be prepared early enough so that it can serve practically as an important contribution to the decisionmaking process and will not be used to rationalize or justify decisions already made.

40 CFR § 1502.5. The Ninth Circuit has joined in this refrain, stressing that "[t]he purpose of an EIS is to apprise decisionmakers of the disruptive environmental effects that may flow from their decisions *at a time when they 'retain[] a maximum range of options.'*" *Conner v. Burford,* 848 F.2d 1441, 1446 (9th Cir.1988) (quoting *Sierra Club v. Peterson,* 717 F.2d 1409, 1414 (D.C.Cir.1983)) (emphasis added), *cert. denied sub nom. Sun Exploration and Production Co. v. Lujan,* 489 U.S. 1012, 109 S.Ct. 1121, 103 L.Ed.2d 184 (1989). In any case, the statement "must be prepared before any irreversible and irretrievable commitment of resources." *Conner v. Burford,* 848 F.2d at 1446. The Ninth Circuit has further warned that "delay in preparing an EIS may make all parties less flexible. After major investment of both time and money, it is likely that more environmental harm will be tolerated." *Environmental Defense Fund v. Andrus,* 596 F.2d 848, 853 (9th Cir.1979).

The decision to commit $5 million of federal funds to Phase III of the Project has already been made. It may be, therefore, that some kind of NEPA compliance—an environmental assessment or EIS—may in fact already be due. Nonetheless, the U.S. Supreme Court requires a "proposal."

Although *Kleppe* fails to define "proposal", the regulations provide some assistance in this regard:

> "Proposal" exists at that stage in the development of an action when an agency subject to the Act has a goal and is actively preparing to make a decision on one or more alternative means of accomplishing that goal and the effects can be meaningfully evaluated.... A proposal may exist in fact as well as by agency declaration that one exists.

40 CFR § 1508.23. This definition is plainly geared toward a more general, functional interpretation of the term, not the literal interpretation urged by the Government.

In this case, the agency, DOE, clearly "has a goal" of implementing Phase III, and it is apparent that its ultimate goal is to see Phase IV through. There is evidence that the Department of Interior shares this goal. If DOE is, as it suggests, soliciting or drawing up contracts to perform the work, it "is actively preparing to make a decision on one or more means of accomplishing that goal." The fact that

DOE has not set forth any written "proposal" is immaterial because "a proposal may exist in fact as well as by agency declaration." *Id.*

The fact that Congress has already appropriated $5 million for Phase III clearly establishes that some kind of proposal has been made. In *National Wildlife Fed. v. Coston,* 773 F.2d 1513 (9th Cir.1985), the Ninth Circuit addressed the significance of appropriations in triggering NEPA obligations. The court held that while the appropriations themselves are not major federal action, *Id.* at 1518, they are the "fund[ing of] actions *already proposed." Id.* at 1518 (quoting *Andrus v. Sierra Club,* 442 U.S. 347, 362, 99 S.Ct. 2335, 2343, 60 L.Ed.2d 943 (1979)) (emphasis added). Because NEPA already applies to, and an EIS duty has already arisen for, the proposed action for which the appropriation is made, any EIS requirement for the appropriation itself would be redundant. *Id.*

Based on this analysis, the $5 million appropriation was made to fund the "already proposed" federal action herein characterized as Phase III. Because a proposal must be deemed to have been made to secure the appropriation, the suit to compel an EIS appears to be, under this approach, clearly ripe. Moreover, because the money has been appropriated, the Government is clearly in the decision-making mode—that in which an EIS is required—deciding precisely how the money will be disbursed and/or how the action will be carried out. There is no risk that the EIS will ultimately prove unnecessary. *See Kleppe,* 427 U.S. at 406, 96 S.Ct. at 2728 (because many "contemplated" projects do not ever ripen into "proposals," EISs for such contemplated projects would be unnecessary wastes of resources). This is a case in which a proposal "exist[s] in fact," whether or not it has ever been formally advanced as such. 40 CFR § 1508.23.

Further, there are additional grounds for finding a "proposal" here. Congress was not acting in a vacuum. It appropriated the money for Phase III in response to an extensive and detailed "Proposal to Establish the Hawaii Geothermal Resource Veri-

fication and Characterization Program," prepared by the Hawaii Department of Business and Economic Development, and submitted to Congress by the State of Hawaii in March 1990 (the "Hawaii Proposal"). In light of DOE's significant role in the greater Project, this is clearly a "proposal" sufficient to trigger NEPA obligations.

The Government cannot argue that this was simply a private proposal which it may yet dismiss without any need for an EIS. *See Daingerfield Island Protective Society, Inc. v. Andrus,* 458 F.Supp. 961, 963 (D.D.C.1978) (rejecting plaintiff's contention that "the Government, *prior* to accepting or rejecting a private proposal submitted to it, must have prepared an EIS."). Under the "state/federal partnership" characterization the Project has received, the state's proposal might even be deemed DOE's proposal as well. And even if the Hawaii Proposal could be properly termed a "private proposal," the proposal *has been accepted* by act of Congress, and has now been served into DOE's court with that formal federal imprimatur.

Now that the proposal is before DOE, NEPA requires that work begin on the prescribed environmental assessments. Under the regulations, such work must begin immediately:

> An agency shall commence preparation of an environmental impact statement as close as possible to the time the agency is developing or is presented with a proposal.

40 CFR § 1502.5

To rule that a proposal on which Congress has already acted is not ripe for NEPA purposes, *i.e.,* does not trigger NEPA obligations, would elevate form over substance. A proposal exists since "an agency subject to the Act has a goal and is actively preparing to make a decision on one or more alternative means of accomplishing that goal." 40 CFR § 1508.23. Moreover that proposal has been given Congressional blessing. The time appears to be ripe for preparation of an EIS.

A separate question remains, however, of whether the time is ripe for an action *to compel* an EIS.

### 2. *Ripeness of an Action to* Compel *NEPA Compliance*

At the hearing, the Government stressed that federal agencies are entitled to a presumption of regularity, and promised that DOE would take steps to comply with NEPA. Government counsel cited the Declaration of John E. Mock, Director of DOE's Geothermal Division:

> DOE is currently preparing a statement of work for a contract to implement the congressional language cited above. As yet, DOE has not contracted with the State for the verification or characterization work to be performed by the State. Prior to any verification or characterization work being undertaken with these funds, DOE will prepare or have prepared for its evaluation under NEPA the appropriate environmental analysis.

Mock Declaration, ¶ 7.

There is a certain inconsistency in the Government's position, however. In its briefs, and as discussed *supra,* the Government has argued that no proposal has been submitted to DOE, and that no duty to perform an Environmental Assessment accrues until there is both a proposal submitted and a report or recommendation from the agency on that proposal. Government counsel promised that if and when some "triggering" event occurs (*e.g.,* a permit application), the applicable agency will not take action (approve the permit) without first jumping through the necessary NEPA hoops.

Aside from the issue of when NEPA obligations are first triggered is the issue of when an agency's compliance (or non-compliance) with NEPA may be challenged and/or enjoined. By arguing that DOE should be given a chance to comply with NEPA and that the agency is already "in the process" of such review, the Government implicitly admits that NEPA obligations have been triggered. The Government's argument then focuses on the contention that its compliance cannot be challenged or enjoined until the time has come for that compliance to be complete. The Government's position is apparently that no injunction can be sought or issued until the money is transferred or contracts are entered. Until that time, the Government asserts that it is entitled to a "presumption of regularity."

Plaintiffs contend, on the other hand, that there is nothing left for DOE to do in this situation except hand the money over to Hawaii's DBED, and even this transfer is not in DOE's discretion. They argue that because no further federal approvals are necessary before the $5 million is used to commence work on Phase III, there is no date certain by which NEPA compliance must be complete and at which review of such compliance would be any riper than it already is.

### a. *The Presumption of Regularity*

The best articulation of the relevant law on an agency's "presumption of regularity" comes from *Conner v. Burford,* 848 F.2d 1441 (9th Cir.1988). *Conner* was a challenge to the sale of oil/gas leases in vast areas of national forest. The suit was based on the government's failure to prepare an EIS as required by NEPA before selling the leases. The court found that the leases contained "no surface occupancy" ("NSO") stipulations prohibiting any surface-disturbing activity, and therefore did not have significant environmental consequences. It concluded that an EIS for such leases could be required only upon the

> [m]odification or removal of an NSO stipulation ..., which ... would constitute an irretrievable commitment of resources requiring the preparation of an EIS.

*Conner,* 848 F.2d at 1447–48. The court refused to anticipate such alteration of NSO stipulations:

> We cannot assume that government agencies will not comply with their NEPA obligations in later stages of development. *Cf. Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 415, [91 S.Ct. 814, 823, 28 L.Ed.2d 136] (1971) (agency action entitled to presumption of regularity).

*Id.* at 1448.[11]

*Conner* relied on *Sierra Club v. FERC,* 754 F.2d 1506 (9th Cir.1985), in which a "preliminary permit" for a hydroelectric project had been issued without conducting an EIS. The court in *Sierra Club* ruled that because the preliminary permit did not authorize any activity on federal land, but functioned simply to maintain the applicant's priority of application for a license, no EIS could be required. *Id.* at 1509. The court observed that "[p]etitioners can only enter federal land and conduct ground-breaking activities after obtaining Forest Service and BLM special use permits." *Id.* Because the court found that action affecting the environment *could not take place* until the permits were issued, the requirements of NEPA could be fully met by conducting the EIS at that later stage.

b. *Where the Agency Denies Any Duty*

In this case, however, the Government has argued that there is/was no proposal before DOE, and there is/was, therefore, nothing for DOE to act on. As discussed above, Government counsel suggested that NEPA obligations would be triggered if a permit were applied for, but refused to speculate as to what, if any, permits might be necessary before work on Phase III begins.

■■■■ Where the agency is arguing that it has no obligation to do anything under NEPA, the court cannot presume that the agency is, at the same time, carrying out the environmental assessments that NEPA requires. Any such "presumption of regularity" is waived or at least vitiated by the Government's contention that it has no NEPA duty whatsoever.

The inquiry does not end here, however, because the Government does not rely solely on its denial of duty argument.

c. *The Point at Which NEPA Compliance May Be Reviewed, Challenged, or Compelled*

■■■■ The Government has also argued that "DOE is currently preparing a statement of work for a contract to implement the congressional language" and that "the appropriate environmental analysis" will be done before any work on Phase III is undertaken with federal funds. Mock Declaration, ¶ 7. As noted earlier, this argument essentially concedes that NEPA obligations have been triggered, and the issue shifts to the question of when the obligation which presently exists can be compelled.

The "presumption of regularity" suggests that this court should assume that DOE will fully comply with its NEPA obligations, and should not interfere until the time has come for such compliance to be complete. At that point, the court can evaluate the adequacy of the compliance, and compel any actions required by law that have been overlooked. The Government suggests that such a time will not be reached in this case until contracts are entered for the performance of the work contemplated by Phase III.

Even if DOE has a role in contracting for the work in Phase III, however, this suit will not necessarily be unripe. The Ninth Circuit has held that when the agency is committed to implementing a project, a suit to compel NEPA compliance need not be delayed until the contracting stage. In *Environmental Defense Fund v. Andrus,* 596 F.2d 848 (9th Cir.1979), the Department of Interior announced a program for marketing reservoir water for industrial uses. The court ruled that the Plaintiffs need not await the entering of actual contracts:

> Here the Secretary of Interior has no intention of abandoning plans for marketing industrial water and is prepared

---

**11.** The *Overton Park* case was a challenge to the Secretary of Transportation's approval of a highway through a state park. In finding that the plaintiffs had submitted insufficient evidence that the Secretary had exceeded his authority in giving such approval, the U.S. Supreme Court observed:

> Certainly, the Secretary's decision is entitled to a presumption of regularity. But that pre-

sumption is not to shield his action from a thorough, probing, in-depth review.

401 U.S. at 415, 91 S.Ct. at 823 (citations omitted). The Court also noted that the Secretary's decision could be overturned if "'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Id.* at 416, 91 S.Ct. at 823 (quoting 5 U.S.C. § 706(2)(A)).

to execute water option contracts. NEPA does not permit delay in assessing the environmental impact of the marketing plan.

*Id.* at 852.[12] Here, given the $5 million appropriation already made for Phase III, as well as the previous undertaking and completion of Phases I and II, the evidence may show that the Secretary of Energy similarly "has no intention of abandoning plans" to implement that Phase. In such a scenario, under *Andrus,* NEPA will not permit further delay, regardless of whether DOE will later be entering into contracts. *See also Lathan v. Volve,* 455 F.2d 1111, 1121 (9th Cir.1971) ("If defendants' contention were accepted—that no environmental impact statement is required until the final approval stage—then it could well be too late to adjust the formulated plans so as to minimize adverse environmental effects.")

There is some question, however, as to the role DOE will play in contracting for the Phase III work. The Congressional action does not authorize DOE to "contract" for that work. It simply provides the $5 million to the State DBED:

> The Committee recommendation also includes $5,000,000 for the State of Hawaii through its [D]epartment of [B]usiness and [E]conomic [D]evelopment to continue the Hawaii geothermal resource verification and characterization projects to help reduce the State's dependency on fossil fuels. The State of Hawaii has assured the Committee that this cost-shared assessment will be conducted consistent with the State's outstanding effort to protect and preserve its unique natural resources.

Conference Report 101–889, Oct. 16, 1990 to accompany HR 5019. This language suggests, and Plaintiffs argue, that Congress did not envision a contracting role for DOE. Rather, it provided the money to

DBED based on assurances *from the state* about how the money would be used, apparently leaving the contracting in the state's hands and discretion.

If this is the case, these facts are distinguishable from *Conner* and *Sierra Club,* both of which anticipated a specific future event, a future federal decision whether to permit the environment-threatening project to go forward. The action already taken in this case, Congressional appropriation of $5 million for the express purpose of implementing the "already proposed" Phase III, may actually be sufficient for work to begin. Neither party has identified any kind of further approval that will be needed before the work on Phase III may commence.[13]

If there is no further federal approval required, if there is no substantial and significant decision-making role left for DOE before committing itself to implementing Phase III, the suit to compel NEPA compliance is as ripe as it will ever be. *Conner* and *Sierra Club* do not control to defeat ripeness unless there is a future point, clearly identified, at which NEPA compliance must be complete and can be reviewed, challenged or compelled. *Andrus* controls to establish ripeness if that future point is the mere implementation of a project or program already embraced and adopted.

This gives rise to a material issue of fact. The court needs more information on DOE's level of commitment to the implementation of Phase III, as well as the precise role that DOE expects to play, will play, and/or must play in the disbursement of the $5 million. If, as the conference report language suggests, DOE has little or no discretion, but must transfer the money directly to DBED, then the time is ripe to consider the adequacy of DOE's NEPA compliance. If, on the other hand,

---

**12.** It is noteworthy that the Ninth Circuit also recognized that each water option contract required a separate EIS. The court held that such "EIS[s] must be prepared *prior to* execution of an option contract." *Andrus,* 596 F.2d at 852 (emphasis added).

**13.** The Government has suggested that further permits *might* be required, and has argued that it is at such a juncture that an EIS could be compelled. But when Government counsel was asked by this court what permits will be required or applied for, he insisted, "I have no idea."

the disbursement of the funds is subject to DOE contracting, and DOE will have to prepare proposed contracts on which it will make recommendations, exercising a discretionary, decision-making role, an action to compel an EIS may be ripe only at that later time.

The presence of these material issues of fact preclude summary judgment as requested by the Government at this stage. Resolution of the issue presented will require further factual findings at trial.

### VI. Major Federal Action—Plaintiffs' Motion for Partial Summary Judgment

The issue is raised in Plaintiffs' Cross–Motion whether the participation of the Government in the Project, as outlined above, constitutes "major federal action" as a matter of law. Plaintiffs have moved for summary judgment on this issue, reserving the remaining two issues for trial.[14]

#### A. The Regulations

■■■ The applicable regulations define "major federal action" to include, *inter alia*, "new and continuous activities, including projects or programs entirely or partly financed, assisted, conducted, regulated, or approved by federal agencies...." 40 CFR § 1508.18(a).

The Government has attempted to de-emphasize the participation of the various defendant agencies in the Project (stressing that the more significant involvement of such agencies will not come until Phase IV), and both parties have argued the significance, or insignificance, of the Interagency Group. The Government relies on *Almond Hill School v. U.S. Dept. of Agriculture*, 768 F.2d 1030 (9th Cir.1985) to argue that such limited participation of federal employees has not been sufficient to turn this local project into major federal action. In *Almond Hill*, California undertook a beetle eradication project, and put three federal government officials on the project's eight-member board of advisors.

Although their salaries were paid with federal funds, these officials did not have a decision-making role. The Ninth Circuit found that the payment of salaries was not a significant enough commitment of federal funds to make the eradication project a "major federal action." 768 F.2d at 1039.

The Government argues that the tangential involvement of salaried federal officials in this case is similarly insufficient to make the Project a federal action. The Government is straining at a gnat but swallowing a camel.[15] In addressing the issue of the role of federal officials in the Project, the Government overlooks the near $40 million in federal funds *directly* contributed to the Project. *Almond Hill* is easily distinguished because in that case, as the court emphasized, "no federal funds [were] sought by the state or spent on the state's beetle eradication project." *Id.*

There is no dispute as to the degree of the Government's financial participation in the Project. The use of federal funds, especially in such amounts and to such a degree (over 80% of total funding) is enough standing alone to render the Project "major federal action." *See, e.g., State of Alaska v. Andrus*, 591 F.2d 537, 540 (9th Cir.1979) ("Most courts agree that significant federal funding turns what would otherwise be a local project into a major federal action."); *Homeowners Emergency Life Prot. Committee v. Lynn*, 541 F.2d 814 (9th Cir.1976) ("Inasmuch as the grant of federal funds unquestionably moves the activity in issue to the point of a federal-city partnership, the project is now a major federal action.").

No matter whether the Project is considered as a single multi-faceted program or segmented into four separate and independent projects, there can be little question that it is major federal activity. Indeed, each of the first three phases independently has received sufficient federal financial funding to qualify as a major federal action: Phase I received $10.7 million;

---

**14.** The issues which would remain for trial are (1) whether such action "significantly affect[s] the quality of the human environment," and (2) what is the appropriate remedy.

**15.** *See Matthew* 23:23–24 (KJV).

Phase II received $24 million; and Phase III has already received $5 million with two more installments of $5 million each likely to come. Although it is not apparent from the record how much, if any, federal money will be utilized in Phase IV, it is clear from the list compiled by the Interagency Group that the federal government will be heavily involved in a permitting role at that stage.[16] Therefore, even if federal financing at that stage is not significant, Phase IV will nonetheless qualify as major federal action because it is a "project[ ] [or] program[ ] entirely or partly ... regulated, or approved by federal agencies." 40 CFR § 1508.18(a).

The enormous commitment of federal resources to the Project easily establishes it as major federal action. These facts are not in dispute, and no facts are alleged which, if proven, could make it otherwise. Further, in addition to the substantial financial commitment to this Project, the court has outlined above the Government's additional substantial involvement and participation at every stage of the Project's history. *See* Section II.C. *supra.* Plaintiffs are entitled to partial summary judgment declaring the Government's involvement in the Project to be major federal action.

## VII. Conclusion

Whereas material issues of fact remain regarding (1) the Government's, specifically DOE's, commitment to implementation of Phase III, and (2) DOE's role with respect to the $5 million appropriation, the Government's motion for summary judgment is DENIED. As the Government's involvement in the Project constitutes major federal action for purposes of NEPA, Plaintiffs' motion for partial summary judgment is GRANTED.

---

**16.** In fact, the Government defends Plaintiffs' Cross–Motion by arguing that most of the defendant federal agencies are not yet involved and will not become involved until the Project reaches the permitting stage in Phase IV. In so arguing, the Government acknowledges the important role numerous federal agencies will have in Phase IV.